# In the
# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 05-2639, 05-2652, 05-2692 & 06-1485

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN J. LEAHY, WILLIAM E. STRATTON,
JAMES M. DUFF, and TERRENCE DOLAN,

*Defendants-Appellants.*

---

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 922—**Elaine E. Bucklo**, *Judge.*

---

ARGUED JUNE 9, 2006—DECIDED OCTOBER 4, 2006

---

Before RIPPLE, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* This appeal stems from James Duff's admitted, successful schemes to cheat the City of Chicago out of funds slotted for minority- and women-owned businesses and to swindle various workers compensation insurance providers out of proper premiums. Duff's expansive plots swept up many of his business associates and family members, and this appeal consolidates a broad range of challenges (by him and them) to pleas, jury convictions, and sentences. We affirm in part and reverse in part.

I.

Two complex fraud schemes hatched by James Duff, a Chicago businessman, are at the heart of this case. Despite the significant overlap between the participants and companies that figure in the two plots, we will discuss the facts of each separately in the interest of clarity.

A.  City Scheme

In 1990, the City Council of Chicago passed an ordinance to grant an advantage to select businesses owned by minorities ("MBEs") and women ("WBEs") in the award of city contract money. Specifically, Chicago's Purchasing Agent had to "establish a goal of awarding not less than 25% of the annual dollar value of all Contracts to qualified M.B.E.s and 5% of the annual dollar value of all Contracts to qualified W.B.E.s." In addition to requiring the heads of departments and agencies to work with the Purchasing Agent to meet this goal, the ordinance also contained an explicit provision setting aside certain contracts for qualified MBEs and WBEs that met "target market requirements." Companies that wished to obtain a contract with the city, but which were neither MBEs nor WBEs, had to commit to expend 25% of the value of the contract with MBEs and 5% with WBEs. The ordinance included subcontracting as one of the various ways to fulfill this requirement. Penalties for a contractor's failure to meet the appropriate percentages ranged from liquidated damages to termination.

While the ordinance provided substantial assistance to MBEs and WBEs, it imposed heavy restrictions on which companies qualified. In particular, it limited its application based both on owner involvement in the business and the level of success achieved by the business. For a business

to qualify as an MBE, one or more members of a minority group must have ownership of 51% of the company, and one or more members of a minority group must have day-to-day management and control. The ordinance defined a WBE in like manner, substituting women for minorities. A figurehead minority or woman owner, therefore, would not be enough for certification; a member of one of these select groups must own and, for all practical purposes, run the business.

There was an additional limitation. Chicago prohibited any "Established Business" from gaining this favored status. According to the ordinance, an established business was one which, "by virtue of its size and capacity . . . does not need to be a participant in the Program in order to effectuate the purposes of the Program . . . ." Giving further guidance, the ordinance presumed a business met this definition if it (and any affiliates) totaled $17 million in average annual gross receipts over a three-year period. This restriction indicates that Chicago was not interested in subsidizing entrenched, successful businesses, even if the businesses were owned by women or minorities. As a former city official put it at trial, "it was a program to assist those companies to win contracts with the City in a competitive situation and become eco-nomically viable so that they, in fact, could compete as prime contractors." In other words, this was an affirmative action program whose fruits were reserved for fledgling minority and women businesses.

When Chicago passed the ordinance, James Duff, a white man, controlled numerous businesses in the city. For purposes of the present discussion, we focus our attention on two of those businesses. First, he controlled Windy City Maintenance ("Windy Maintenance"), a company providing janitorial services, which Duff incorporated in 1989. While

his mother, Patricia Green Duff ("Green Duff"), was Windy Maintenance's sole shareholder, this was an empty formality as she had no real involvement with the business, exercising no control over its affairs and spending considerable time in vacation homes in Florida and Wisconsin. Duff himself actually ran Windy Maintenance, making all substantive financial and business decisions, including hiring employees and negotiating contracts. Second, Duff controlled a company named Remedial Environmental Manpower ("Remedial"), which "manage[d] and provide[d] manpower for environmental cleanup." Remedial was incorporated in 1988, and its purported owners were William Stratton ("Stratton"), who owned fifty-five percent of the stock, and Green Duff, who owned the remaining forty-five percent. Stratton, a black man, acted as the occasional driver and companion of Duff's father, a friendship dating back to earlier union days. Stratton routinely came to the Remedial office (space shared with a number of other Duff businesses) shortly before lunch in the company of Duff's father and, while there, mainly played cards with members of the Duff family and watched television. For the early part of its existence, Remedial was more of an empty shell than a thriving concern, or as Duff himself put it, "a company that didn't work out." To the extent that Remedial was an actual company, however, Duff was in charge.

With Green Duff and Stratton in the ownership positions of these companies, Windy Maintenance and Remedial appeared, at least superficially, well-positioned to obtain WBE and MBE certification after the passage of the ordinance. Of course, for either to gain such a status, Duff would need to obscure his kingship over the companies.

Windy Maintenance was the first to try to take advantage of the ordinance. In 1991, it applied for certification as

a WBE, claiming in the application that Green Duff, who used her maiden name, Patricia Green, both owned and ran the company. Green Duff repeated this representation to city officials during a subsequent certification interview, and Windy Maintenance obtained the desired certification as a WBE. Windy Maintenance retained this position for several years, with corporate officers, such as Terrence Dolan, submitting annual renewal applications that reiterated the false description of Green Duff's role.

Windy Maintenance's certification allowed it to win lucrative contracts with Chicago and subcontracts with City contractors specifically because of its WBE status. In particular, Windy Maintenance entered into subcontracts to provide janitorial services for a terminal at O'Hare International Airport and the Harold Washington Library. Windy Maintenance also contracted directly with Chicago for similar services at the city's 911 Center and a district of the Chicago Police Department. In 1999, Windy Maintenance informed the city that it would no longer apply for WBE certification as it had reached the maximum dollar limits it could obtain under the program. Over the years in which Windy Maintenance was certified as a WBE, it obtained $37,512,279 from these contracts and subcontracts. Throughout this time, Duff was totally in charge at Windy Maintenance.

Remedial's big break came slightly later than that of its sister company. In approximately 1991, Duff was approached by James Barry, a long-time friend and business associate, to discuss providing the labor portion of a bid that Barry's company, Waste Management of Illinois ("Waste Management"), was submitting to Chicago. Chicago was looking for a company to provide construction, administration, and labor services for four new recycling centers as

part of the city's Blue Bag recycling program. Of course, Chicago's involvement meant that the winning bid had to comply with the strictures of the 1990 ordinance. Duff responded to Barry's solicitation that he could not only fulfill Waste Management's labor needs, but could do so using a company that could achieve MBE certification—Remedial. Remedial's lack of work experience did not faze Barry. He was selecting Duff, a friend and established businessman who had consistently met Barry's expectations in past projects, while getting credit for hiring an MBE. As Barry put it at trial, "it was my understanding that no matter what the ownership structure of the company would be, that I was going to continue to deal with Jimmy and rely on Jimmy to operate and control." After eventually winning the Blue Bag contract, Waste Management designated Remedial as its MBE subcontractor in its 1993 plan to the city.

Obtaining certification as an MBE turned out to be a much trickier proposition for Remedial than it had been for Windy Maintenance. In 1993, Remedial submitted its initial certification affidavit to the city's purchasing agent for approval. This application revealed that Ellen Niemeier was the sole minority shareholder and contained no references to Duff's mother, Green Duff. Duff's influence had not diminished, as Ellen Niemeier happened to be his wife. Nonetheless, the application raised a variety of concerns with the relevant Chicago officials. In particular, they had questions about the roles of Stratton and Niemeier, as well as Remedial's overall viability and independence, worries prompted by several allusions to Duff and his companies on the application. These concerns were heightened when the city contacted clients of Remedial who indicated that they only dealt with James Duff. Faced with a variety of red flags, the city issued a preliminary denial of MBE status in 1993.

For his part, Stratton immediately and vigorously op-
posed this ruling in meetings and through a number
of filings, including an affidavit from Duff expressly
denying his involvement with Remedial. Still, the city
held strong. In 1994, however, Remedial submitted an
entirely new application that reported Stratton was the
sole owner of the business and that removed all of the
troubling references to Duff and his companies. After
another review, the city changed course and approved
Remedial as an MBE. Obtaining MBE status, Remedial
officially became an MBE subcontractor in the city's
Blue Bag program, providing the labor for Waste Manage-
ment at the four recycling centers. During the life of its
contract with Waste Management, Remedial received
approximately $74,849,310 from the city program.

During the 1990s, money often flowed through Windy
Maintenance and Remedial (and other Duff-controlled
companies) to American Management and Consulting
("American"). While American was supposedly a consulting
company, in actuality Duff, its owner, basically used it as a
payroll company. Duff would instruct his payroll specialist
to transfer money from a company like Remedial to Ameri-
can, then make payments to family members and others out
of that account. Moreover, Stratton and other employees
would often receive and cash large checks, and, on Duff's
instructions, would return the entirety of the proceeds to
Duff for his use.

Duff's shenanigans eventually garnered media scrutiny,
which led to a city investigation into the propriety of the
certifications. In order to evade city investigators, Duff
had office personnel spend weeks tutoring Green Duff
so that she could give the impression that she actually
ran Windy Maintenance. To complete the illusion, Duff

installed Green Duff in his actual office, going so far as to change the buttons on the switchboard to reflect that the main office was hers. While Green Duff had a rocky interview with city inspectors, Duff convinced his employees and business associates to corroborate the story that she was in charge. In particular, Duff's primary insurance agent, John Leahy, told Adrienne Hiegel, an assistant state's attorney, that he met solely with Green Duff on insurance matters for Windy Maintenance and that he had no contact with Duff on these matters. The ruse worked, and Chicago's investigation faltered. Likewise, Stratton convinced city investigators he actually ran Remedial.

While the city could not pierce the conspiratorial curtain, federal investigators eventually did. As will be explained further in conjunction with the insurance scheme, in 2003, Duff, Stratton, Green Duff, and Dolan were each indicted for offenses arising out of their actions in the city scheme.

### B. Insurance Scheme

We now shift our attention to Duff's endeavors to cheat his insurers, a fraud of even longer duration. This scheme introduces yet another company controlled by Duff: Windy City Labor Service ("Windy Labor"). Windy Labor provided temporary employees to various liquor warehouses and other clients.

Before detailing the scheme, a working knowledge of the mechanics of the Illinois workers compensation system is necessary. Illinois generally requires employers to have workers compensation insurance. Because some employers with high risk histories would be unable to obtain

insurance in the open, voluntary market, Illinois created an assigned risk pool to provide insurance to these businesses. While all insurance companies providing workers compensation insurance contribute to the assigned risk pool, a small subset actually administer the insurance policies in the assigned risk pool, charging higher premiums (because of higher risks) and obtaining reimbursements for their costs. A business can apply for assigned risk insurance only after receiving two rejections on the voluntary market. When a business applies, Illinois itself actually does not decide upon the carrier but farms this task out to the National Council on Compensation Insurance (the "Insurance Council"). The Insurance Council assigns applicants to participating insurance companies and sets advisory rates for the calculation of premiums.

Premiums for workers compensation insurance are calculated using three independent factors. First, the insurance company must determine the correct classifications for the various jobs performed by the insured's employees. Each type of job has an advisory rate set by the Insurance Council, which reflects the relative riskiness of that position. The second factor is the amount of payroll in each job classification. The premium's final element is the experience modifier, a number determined by the Insurance Council that compares an employer's past claim history to the past claim history of the average employer in that job classification. If a company has a claims history that is average in its field, the experience modifier will be one. As the number of claims increases, so does the modifier (and by extension, the premium). However, an extremely high modifier, for example one reflecting double or triple the average amount of claims, might instead indicate improper classification of employees. The insurance company calcu-

lates the premium by multiplying the job classification rate by the payroll and that amount by the experience modifier.

With this background, we now examine Duff's insurance fraud. Windy Labor first applied for placement in the assigned risk market through its insurance broker, John Leahy of Leahy & Associates, in 1982. In the initial application, Leahy described Windy Labor as a company that "will provide various labor type jobs as they arise. The work will vary, will include janitorial work, truck helpers, warehousing, bottling. It is a temporary service for labor-type work." The initial classification codes submitted—warehousing, bottling, janitorial, and truck helper employees—were consistent with this information. A report from later in the year was even more blunt in its assessment of the Windy Labor work force: "As mentioned, these are usually people out of work or skid row bums working for drinking money." The Insurance Council assigned Windy Labor to Casualty Insurance ("Casualty") as its workers compensation insurance provider.

Casualty provided Windy Labor with insurance from the assigned risk pool until 1995. During this time, Windy Labor applied annually for renewal of this insurance, sending updated payroll and classification numbers. These renewals were largely automatic between Windy Labor and the insurance provider, but Casualty continued to send Leahy & Associates copies of policies and applications. For the first few years, the classifications remained constant, but in 1985, a drastic shift occurred. The application introduced a clerical workers category and, from the start, this new classification included the largest portion of payroll, dwarfing other more established categories such as warehousing and janitorial. Again, Leahy & Associates received a copy of the policy reflecting this change from Casualty.

Throughout the remainder of Windy Labor's relationship with Casualty, the clerical category continued to dominate the other classifications, ending with over $1.7 million out of a total payroll of approximately $2.1 million in that category. While the categories had changed on paper, Windy Labor had not actually shifted its operations from labor to clerical work. Duff had decided to keep the premiums down by making what would turn out to be massive and long-term misrepresentations.

To effectuate this scheme, Duff wove an intricate web of lies using employees and business associates. Duff met with auditors, giving fake figures regarding the business, and initiated his office manager in the ways of falsely representing the employees as clerical. Windy Labor provided client lists with false designation and engaged in delay and suppression of payroll records.

Red flags flew. Casualty obtained loss runs, which are summaries of the injury claims, and showed nearly all Windy Labor injuries coming from the warehousing class, even though clerical was dominant. Casualty also sent multiple notices of cancellation during the period of coverage because of Casualty's inability to complete audits. While the policy was never cancelled, Casualty transmitted these notices to Leahy & Associates. Casualty did not catch on to the fraud before it left the assigned risk pool in 1995.

When Casualty left the assigned risk pool in 1995, Windy Labor had to apply for a new assigned risk carrier. This became a familiar refrain, as Windy Labor was left searching for carriers in 1998, 1999, and 2000.[1] The person at Leahy

---

[1] For purposes of completeness, the relevant carriers were
(continued...)

& Associates responsible for the account was Edward Wisniewski, who assumed this duty in 1989. Wisniewski's primary role was completing insurance applications and contracts, though he also interfaced between Windy Labor and the relevant insurer, passing along any concerns or questions from one to the other.

Despite the frequent turnover in insurance companies, the scheme continued. Duff remained resolute in his belief that the premiums were too high and continued to have his office employees overstate the clerical portion of the workforce. Complicating matters for Windy Labor, the insurance companies expected to conduct routine audits to verify the information on the policies. Rather than giving the information, which would reveal the plot, Windy Labor employees stonewalled auditors, submitted false worker information and client lists, and even forged a letter supposedly from an outside accountant that confirmed the lies.

Windy Labor's actions did not go completely unnoticed. Both USF&G and Kemper threatened to cancel their policies for failure to submit to audits. Wisniewski was informed and often worked with Windy Labor employees to avert this possibility by revealing some information that would satisfy the insurer without endangering the scheme. This worked to some extent. For example, USF&G left the assigned risk pool in 1998 without ever completing its final audit. For its part, the Insurance Council tried to untangle the disconnect between the small number of warehouse workers and the huge number of claims emanating from

---

[1] (...continued)
USF&G (1995-1998), Kemper (1998-1999), Amcorp (1999-2000), and Travelers (2000-present). We will discuss each as necessary to illuminate the fraud.

this class. In response, Wisniewski and Windy Labor offered a compelling mix of rationalizations and false information, including doctored client lists, to defuse the inquiry.

Circumstances surrounding Kemper's response to its unsatisfying audit cast some additional light on the fraud. Receiving a cancellation notice in 1999, Duff instructed his office manager, Cathy Martinez, to call Leahy to sort out the problem. Martinez and another Windy Labor employee, Heather Placek, had a conference call with Leahy and Wisniewski shortly thereafter. Without going into the details of the situation, Martinez told Leahy that Duff asked her to talk to him. According to Martinez, Leahy's response was "you know, you got to do whatever you got to do to get this done or you're not going to have insurance." At this point, Placek, who had limited exposure to the insurance scheme, pointedly stated, "Has this occurred to anyone that this is insurance fraud?" According to Martinez, after a pause, Leahy again responded that Windy Labor had to do whatever it took to get this done, or they would not have insurance. Eventually, the plotting was rendered irrelevant when Illinois would not let Kemper terminate the insurance contract for procedural reasons. Still, Windy Labor's actions had significant repercussions. As Kemper had not been able to complete its audit, Windy Labor was barred from placement in the assigned risk pool. Moreover, Kemper referred Windy Labor to the Insurance Council, alerting that organization to its belief that Windy Labor was engaging in premium misrepresentation.

The failure to complete audits, however, was not the only red flag. Windy Labor had an extremely high experience modifier during this time because of its rampant misclassification of its work force. At one point, the experience modifier reached 3.23, which meant that Windy Labor

had more than three times as many accidents as the average employer in its category. As one USF&G employee testified at trial, "this mod actually is extremely high, considering that . . . most of the employees were clerical . . . [b]ecause clerical positions normally don't generate a high percentage of loss or injury on the job." Later, when Windy Labor was barred from the assigned risk pool in 1999, Leahy & Associates turned to another broker, Vincent Braband, to help with obtaining insurance in the voluntary market. While reviewing the file, Braband immediately noticed the extremely high experience modification factor (2.78), which was the highest he had seen and which he took as a signal of misclassification. This notion was confirmed when he sent the numbers to Amcorp Insurance, whose agent also noted the modification factor and felt that it was a clear sign of misclassification.

Leahy & Associates, uniformly in the person of Wisniewski, repeatedly learned of these red flags. At one point, USF&G contacted a Windy Labor client who actually spoke candidly (and truthfully) about what Windy Labor workers did at his company. Upon learning of this conversation, Wisniewski responded that the information was wrong and relayed the issue to Duff, who pressured the client into retracting. A few years later when Braband was attempting to find a voluntary carrier for Windy Labor, he inspected the file and spotted the small labor classification with an extremely high number of manual accidents. Together with the experience modification issue, Braband felt the clerical was grossly overestimated and told Wisniewski as much, explaining that he needed correct classifications for any possibility of placement. Faced with these objections, Wisniewski immediately submitted new numbers to Braband, flipping the clerical payroll from $1.2 million to $600,000, the warehousing amounts from $75,000

to $1.2 million, and the janitorial amounts from $91,000 to $800,000. Eventually, Amcorp agreed to insure Windy Labor, but the premium was more than three times what Windy Labor had been paying.

In 2000, after Amcorp declined to renew Windy Labor's voluntary policy because of the high rate of claims, Duff decided to combine Windy Labor with a different Duff company that had a good insurance track record, Remedial. Hoping to avoid revealing Windy Labor's experience modifier (and take advantage of Remedial's low modification factor), this transaction was styled as a purchase and not disclosed as required. Despite repeated requests by insurance providers for information about the combination, Wisniewski and Windy Labor/Remedial employees (including Stratton) stonewalled and responded that no such information was needed. On account of this tactic, Remedial had problems obtaining insurance for the Windy Labor portion of the business. Eventually, however, it contracted with Travelers, which forced Remedial/ Windy Labor to send, in 2001, a form acknowledging the merger after Travelers threatened cancellation of its policy. Travelers continues to provide workers compensation insurance to Remedial, though the Insurance Council adjusted the experience modifier based on the completed form.

Through this extensive scheme to hide the true nature of Windy Labor's business, the company paid approximately $1.09 million less in premiums than it should have.

## C. Trial

In 2003, the federal government charged the major players in the Duff frauds in a thirty-three count indictment covering both schemes. Basically, the indictment charged the

various defendants with violations of RICO, mail and wire fraud statutes, money laundering, and tax offenses. Shortly before trial, Duff pleaded guilty to all counts. Dolan followed suit. Although Green Duff was indicted, prosecutors declined to try Green Duff because of a rapid decline in her mental health. Wisniewski, Leahy, Stratton, and a Remedial supervisor, Starling Alexander, went to trial. After a month-long trial, the jury returned guilty verdicts for all the defendants except for Alexander, who was only tangentially involved in the scheme.

The district court sentenced Duff to 118 months' imprisonment and ordered restitution in the amount of $12,026,582.02. The district court sentenced Stratton to seventy months' imprisonment and restitution in the amount of $7,370,739.00. The district court sentenced Dolan to twenty-one months' imprisonment. The district court sentenced Leahy to forty-six months' imprisonment and ordered restitution in the amount of $1,093,566.00. Wisniewski received a sentence of a year and a day and chose not to appeal.

## II.

In this consolidated appeal, the defendants attack jury convictions, pleas, and sentences. For Duff, Dolan, and Stratton, the centerpiece of their appeals challenges the sufficiency of the indictment, alleging that the fraud on the city could not meet the requirements of mail or wire fraud. Building from this foundation, Stratton, joined by Duff, argues that, if the mail and wire fraud counts do not constitute crimes, the money laundering charges, which rely on them, necessarily falter. Stratton also challenges the prejudicial spillover effect of this allegedly improper city

scheme evidence, which he believes led to his conviction on the RICO conspiracy and the insurance fraud counts.

In addition to the major argument concerning the wire and mail fraud counts, Duff raises a number of challenges to his sentence. He first contends that the district court should not have calculated his guidelines offense level using a $10 million loss to the city since, he claims, the city actually lost nothing on the contracts. Duff also asserts that the district court erred by not awarding him a full three-point reduction for acceptance of responsibility and by applying several improper enhancements. Finally, Duff argues that restitution to Chicago was improper, returning to his theme that the city suffered no loss.

Leahy, for his part, begins with a sufficiency of the evidence challenge and also contends that the district court erred by delivering an "ostrich" jury instruction. Leahy also faults the district court for a range of evidentiary decisions. He proceeds to argue that the district court erred by not severing the trial of the insurance fraud counts from the trial of those counts involving the city scheme. Leahy concludes his challenges by asserting that the district court improperly calculated the period of his involvement in the conspiracy, which redounded to his detriment at sentencing.

## STRATTON, DUFF, AND DOLAN'S TRIAL, PLEA, AND SENTENCING ISSUES

### A.

We first consider Duff, Dolan, and Stratton's argument that the city scheme referenced in the indictment cannot support a conviction under the applicable mail and wire fraud statutes. Specifically, they contend that the only loss Chicago suffered was to its regulatory interests—an intangi-

ble right unprotected by these statutes. We review a challenge to the sufficiency of an indictment de novo. *See United States v. Gee*, 226 F.3d 885, 891 (7th Cir. 2000); *United States v. Briscoe*, 65 F.3d 576, 582 (7th Cir. 1995).

We begin our evaluation of the indictment's validity by examining the words of the relevant statutes, the first being mail fraud.

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, . . . shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.

"The elements of wire fraud under 18 U.S.C. § 1343 directly parallel those of the mail fraud statute, but require the use of an interstate telephone call or electronic communication made in furtherance of the scheme." *Briscoe*, 65 F.3d at 583. The requisite elements of these offenses, therefore, are three: (1) a scheme to defraud; (2) an intent to defraud; and (3) use of the mails or wires in furtherance of the scheme. *See United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004); *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002). Cases construing one are equally applicable to the other. *See United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005). To show the intent to defraud, we have consistently required a "wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to

another." *Britton*, 289 F.3d at 981. *See also United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001); *United States v. Hickok*, 77 F.3d 992, 1003 (7th Cir. 1996) (stating that mail and wire fraud are specific intent crimes). These statutes do not require the government to prove either contemplated harm to the victim or any loss. *See United States v. Vincent*, 416 F.3d 593, 600-01 (7th Cir. 2005) (addressing loss); *United States v. Fernandez*, 282 F.3d 500, 507 (7th Cir. 2002) (discussing contemplated harm). Moreover, a defendant's honest belief that his actions will ultimately result in a profit and not a loss is irrelevant for determining whether a violation has occurred. *See Davuluri*, 239 F.3d at 906; *United States v. Masquelier*, 210 F.3d 756, 759 (7th Cir. 2000).

The mail and wire fraud counts of the indictment dedicated to the city scheme (Counts 2-15) charged that Duff, Stratton, Dolan, and others hatched and executed a plan to obtain fraudulently over $100 million in contracts and subcontracts from the city of Chicago by lying about the Windy Maintenance and Remedial ownership structure. The indictment goes on to detail precisely how Duff and the others used or caused to be used the mails and wires in furtherance of this scheme.

The defendants, however, believe that, despite its express references to the money they obtained, the indictment did not allege a deprivation of money or property. They arrive at this interesting conclusion by positing that Windy Maintenance and Remedial fulfilled their obligations under the relevant contracts or subcontracts. The argument continues that because the city would ostensibly have paid the same for the provided services regardless, Chicago lost no money. According to the defendants, Chicago only lost a regulatory interest in controlling exactly where its money went. They conclude, therefore, that the mail and wire fraud

counts of the indictment charged an intangible rights scheme, which cannot survive under Supreme Court precedent like *McNally v. United States*, 483 U.S. 350 (1987) and, more recently, *Cleveland v. United States*, 531 U.S. 12 (2000).

Despite the defendants' contortions to squeeze this case into the intangible rights category, we cannot agree that it is such a case. The mail and wire fraud statutes require that the object of the fraud is money or property, rather than an intangible right.[2] *See Cleveland*, 531 U.S. at 15 (stating that "for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim"); *McNally*, 483 U.S. at 360. In *Cleveland*, the scheme turned on defrauding the government out of a video poker license by making false statements on the licensing application. *Id*. at 15-17. The Supreme Court indicated that a violation of § 1341 or § 1343 must implicate a government's role as a property holder, not just its role as sovereign. *Id*. at 23-24. In *Cleveland*, the Court found that falsely obtaining a license did not. *Id*. at 21-23. The Court noted that the licenses sought "do not generate an ongoing stream of revenue" and, importantly for the present case, "the Government nowhere alleges that Cleveland defrauded the State of any money to which the State was entitled by law." *Id*. at 22. Turning its attention to the government's argument that the state had a right to choose to whom it would award a license, the Court responded that this was not a property right, but an intangible right—the power to regulate. *Id*. at 23.

---

[2] We, of course, acknowledge a limited exception to this rule for the deprivation of the "intangible right of honest services." 18 U.S.C. § 1346. Congress grafted this additional ground for mail and wire fraud on to the money and property requirement in response to *McNally*. *See Cleveland*, 531 U.S. at 19-20.

In our case, however, the scheme precisely and directly targeted Chicago's coffers and its position as a contracting party. As opposed to the situation in *Cleveland*, the indictment here alleges a plot with an aim different from obtaining licenses or certifications. *Cleveland* addresses a situation in which a defendant commits fraud against a governmental body only acting as regulator; here the fraud was committed both against Chicago as regulator and also against the city as property holder. The certifications were necessary steps, but they were not the object of the long-ranging fraud. That object was money, plain and simple, taken under false pretenses from the city in its role as a purchaser of services.

We cannot agree with the defendants that previous cases from our court aid their quest to remove the present fraud from the reach of the federal mail and wire fraud statutes. In *United States v. Ashman*, 979 F.2d 469, 479 (7th Cir. 1992), we found that one aspect of a fraudulent trading scheme did not qualify as mail or wire fraud under the federal statutes because there was no possibility of a loss given the structure of the daily trading rules. Put another way, while fraud occurred, no money or property was possibly at issue, so these limited segments of Ashman's overarching fraud could not be punished under § 1341 or § 1343. *See id*. The defendants try to fit the present case under *Ashman* by arguing that Waste Management and other such general contractors had agreed with Chicago for a price for labor or janitorial services, and the price was inflexible, regardless of the fraud. This is a much different case from *Ashman*, which involved a complete physical impossibility of loss due to the way that the trading market was set up. In this case, Chicago simply received one type of services it contracted for through these subcontracts—cleaning and janitorial services. Chicago

completely lost the other type of services for which it was paying the contractors and the Duff companies—services performed by an MBE or an WBE precisely because the company is a qualified MBE or WBE. Windy Maintenance and Remedial would not have received the subcontracts, and the general contractors ostensibly would not have won the bids, without the fraudulently gained certifications. Chicago suffered a loss of money in that it paid for a service provided by an MBE or WBE that it did not receive, and *Ashman* does not compel us to conclude otherwise.

Nor do we believe this case similar to *United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993). In that case, a sports agent signed secret contracts to become the agent for a variety of athletes while they were still in college and receiving scholarship money. *See id*. at 1221. The government's theory was that Walters committed fraud by causing the universities to pay scholarship money to students who were ineligible, thus resulting in a loss of money to the universities. *See id*. We found the prosecution defective because the universities "were not out of pocket *to Walters*." *Id*. at 1224 (emphasis in original). Walters did not obtain any money from the universities as part of his scheme to defraud. In this case, Duff and his cronies engaged in a fraud directly targeting the city and, unlike Walters, obtaining money from Chicago through the fraudulent scheme.

Looking at the requirements for mail and wire fraud, the indictment establishes each element. First, it alleges a scheme to defraud the city of money by obtaining contracts through false pretenses. Both the direct contracts with Chicago and the various subcontracts would not have been awarded in the absence of the MBE/WBE certifications obtained through fraud. Second, the indictment shows an intent to defraud Chicago out of its money by engaging in

this practice. As stated above, it does not matter that Duff and his cronies thought that Chicago was getting a service worth every dime in the contracts.[3] All that is required is a wilful act with the intent to deceive or cheat by each of the defendants, which the indictment demonstrates. Specifically, Duff deceived Chicago regarding the true status of his companies. Finally, the mails and wires were used in furtherance of the scheme. Therefore, we conclude that the district court correctly rejected the defendants' argument challenging the sufficiency of the indictment.[4]

---

[3] As the government clearly stated at oral argument, Chicago was aware that the services rendered by the MBEs or WBEs would not be the most efficient or the lowest-priced possible. Nonetheless, the "city was willing to pay these premiums [ ] to these MBE/WBE contractors in order to foster their growth and to permit them to earn a profit that they would otherwise not have access to on a purely open bidding system." A corollary of this proposition is that an efficient, established business, given the advantage of MBE/WBE status, would earn more than it would normally receive under a truly open bidding system, in which it would compete against similarly established companies with the same experience and efficiencies of scale. Duff was a highly experienced businessman who easily made substantial profits off the MBE/WBE contracts and paid the surplus to family members and associates who performed little or no work for the various entities under contract. At sentencing, the district court emphasized that the goal of Chicago's program was fundamentally frustrated, remarking "it's a double loss, the loss that we computed and the real loss to all the people that didn't get this business, that didn't get a chance to build their businesses, . . . that didn't get a chance to become successful minority- and women-owned businesses, because this huge amount was diverted."

[4] Given our decision that the indictment properly alleged
(continued...)

B.

We proceed to Duff's contention that the district court improperly calculated his offense level on the fraud convictions because Chicago suffered no loss. Both parties agree that Guideline § 2F1.1 applies to this case. This guideline provides a base offense level for crimes involving fraud and deceit, then increases the offense level depending on the amount of money at issue. U.S.S.G. § 2F1.1(1998). We review the definition of loss de novo, and the district court's calculation of the amount of loss for clear error. *See United States v. Vivit*, 214 F.3d 908, 914 (7th Cir. 2000). Here, the district court determined that the amount of loss was the amount of profits that Duff gained from the city scheme.

We agree with Duff that the district court incorrectly calculated the amount of loss, but this result will likely not mollify him because we further believe that the district court's figure was too low, not too high. Generally, loss under § 2F1.1 "is the value of the money, property, or services unlawfully taken." U.S.S.G. § 2F1.1 application note 8. As the district court concluded, however, a different,

---

[4] (...continued)
offenses under § 1341 and § 1343, Duff and Stratton's challenge to the money laundering convictions also must fail as it is based solely on the alleged impropriety of the mail and wire fraud charges. Stratton further claims that evidence of the city scheme had an improper prejudicial spillover effect that led to his conviction on both the RICO count (Count 1) and a count of mail fraud relating to his limited participation in the insurance scheme (Count 22). This argument hinges on the contention that the mail and wire fraud charges should have been dismissed and the evidence should not have been presented. As we have ruled that Chicago's scheme charges were proper, this argument likewise must fail.

more specific, application note applies in this situation. Application note 8(d) provides: "In a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses." Duff argues that this is not a case of "government program benefits" and that the application note governing contract procurement should apply. Duff is wrong. As the ordinance itself states, "[a]n effort to direct contracts to minority- and women-owned businesses is required to eradicate the effects of discrimination." This was an affirmative action program aimed at giving exclusive opportunities to certain women and minority businesses. The contracts which these businesses received pursuant to this type of program constitute government benefits. We are not alone in this conclusion. *See United States v. Bros. Constr. Co. of Ohio*, 219 F.3d 300, 317-18 (4th Cir. 2000). Application note 8(d), therefore, applies.

The district court, however, erred when it did not calculate the loss under application note 8(d). Instead of computing the total "value of the benefits diverted from intended recipients or uses" in its analysis, it used the contract loss formula of "contract price minus the benefit provided." Once the district court determined that this was a case involving diversion of government benefits, however, it was bound to follow the application note that governed this situation. *See United States v. Sorensen*, 58 F.3d 1154, 1158-59 (7th Cir. 1995). The correct amount under application note 8(d) is the value of the benefits diverted, which was over $100 million.[5]

---

[5] To its credit, the district court itself expressed reservations about using the contract method of evaluating loss, stating "[i]n

(continued...)

Nonetheless, a remand is unwarranted because the government did not cross-appeal on this issue. Moreover, the fraud counts were grouped with the money laundering counts pursuant to Guideline § 3D1.2(d), and Duff was sentenced based on the money laundering convictions, as they carried the highest offense level. U.S.S.G. § 3D1.3. Even including the proper amount of the loss attributable to the wire and mail fraud, it appears that the money laundering offense level would still be higher, so a remand would change nothing.

### C.

Turning to Duff's next challenge, he believes that he was entitled to a three-point reduction in his offense level because of his acceptance of responsibility. As this is a factual finding, we review the district court's decision not to award any points for clear error. *See United States v. Gilbertson*, 435 F.3d 790, 798 (7th Cir. 2006); *United States v. McIntosh*, 198 F.3d 995, 999 (7th Cir. 2000). The defendant bears the burden of proving that he deserves such a reward. *See McIntosh*, 198 F.3d at 999. We afford the district court large discretion in making this determination because the sentencing "judge is in a 'unique position to evaluate a defendant's acceptance of responsibility.' " *Gilbertson*, 435 F.3d at 799 (quoting U.S.S.G. § 3E1.1, cmt. 5). We allow district courts to exercise common sense when evaluating the testimony and the defendants. *See McIntosh*, 198 F.3d at 999. An appellate court is inherently ill-equipped to make

---

[5] (...continued)
writing this opinion, I am less convinced that I was correct in determining 'loss' not to be the entire amount of the contract."

this determination by the very nature of our review, as we face a cold record, while the district court actually heard the tenor of the defendant's words and studied his attitude. *See Gilbertson*, 435 F.3d at 799.

Guideline § 3E1.1 provides that a court is to give a two-point reduction if the defendant "clearly demonstrates acceptance of responsibility for his offense," and that a court may give an additional point if the acceptance is timely. The application notes to this guideline lay out a variety of factors that a court should consider when making this determination. Among these factors are whether the defendant truthfully admitted the conduct, whether the defendant voluntarily made restitution prior to adjudication of guilt, whether the defendant gave voluntary assistance in the recovery of the fruits of his offenses, whether the defendant underwent post-offense rehabilitative efforts, and the timeliness of the defendant's acceptance of responsibility. U.S.S.G. § 3E1.1 application note 1.

The district court did not clearly err when it refused to decrease Duff's offense level. Duff suggests that the district court did not attach enough weight to his factual basis, plea of guilty, and expressions of remorse, while emphasizing too greatly his less-than-forthcoming attitude at the plea hearing. Given the amount of latitude we afford to the district courts in this arena, we disagree.

First, the district court judged that Duff's plea did not reflect a true belief that he was culpable, but a calculated decision to gain the advantage of the reduction. Acceptance of responsibility usually will be awarded after a guilty plea, but such a plea does not transform this reduction into a matter of right. *See United States v. Willis*, 300 F.3d 803, 807 (7th Cir. 2002); *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005). Looking at the factual basis and plea hearing,

Duff made halting admissions, even to simple questions, and refused to go beyond the bare bones of the indictment, making the government and the district court struggle to obtain many crucial answers about the city scheme. Duff did accept and admit many of the non-critical portions of the indictment, but consistently fought to reframe the city scheme in his own best interests. While a " 'defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction,' " *United States v. Carroll*, 346 F.3d 744, 750 (7th Cir. 2003) (quoting U.S.S.G. § 3E1.1 application note 1(a)), this does not mean that the district court must blind itself to a defendant's conduct and attitude when pleading guilty, especially as here when the defendant seems to be using the plea hearing to minimize his activity to evade future scrutiny. If the defendant takes an overly aggressive posture, this could mean that he does not actually accept his fault. We cannot categorically say that a district court must ignore such indications simply because a guilty plea is involved.

Still, if Duff's conduct at the plea hearing constituted the district court's only justification for denying this reduction, we would be faced with a very close case. But here, the district court went further both at the sentencing hearing and in its sentencing memorandum and catalogued additional support for its conclusion that Duff did not really think he was not to blame, no matter his mouthed words of remorse. Specifically, the district court mentioned that Duff's contention that "no one else could have done the contracts" showed no appreciation for the harm he caused. The district court was also disturbed by Duff's failure to acknowledge a fact conclusively demonstrated at trial—that Duff used his companies to pay Stratton and family members even though they did no work. As application note 1(a)

states, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines true has acted in a manner inconsistent with acceptance of responsi-bility." U.S.S.C. § 3E1.1 application note 1(a). The district court had extensive opportunities to observe and listen to Duff and determine whether he was sincerely contrite or engaged in spin. Based on our searching review of the plea hearing, the sentencing hearing, and the sentencing memo-randum, we cannot say that the district court abused its discretion in concluding that Duff had failed to accept "moral responsibility" for his crimes.

Ultimately, however, even if we believed that the dis-trict court committed some error regarding acceptance of responsibility, it was harmless. In its sentencing memoran-dum, the district court stated "[s]ince this sentence, under *Booker*, is not limited to consideration of a narrow range following a strict determination of points under a particular Guidelines Manual, however, I considered the sentencing range that would be applicable with or without acceptance of responsibility." The transcript from the sentencing hearing also shows the district court properly calculated guideline ranges both with and without the acceptance of responsibility points. The court then decided upon a sentence of 118 months and gave a lengthy explanation both at the hearing and in the memorandum regarding its decision. As the sentence would have been imposed no matter the ruling on acceptance of responsibility, Duff suffered no harm.[6]

---

[6] In the event that we had ruled in his favor on the fraud and money laundering counts, Duff presented several additional arguments regarding enhancements. As we did not agree with his

(continued...)

D.

Moving to his actual sentence, Duff mounts a reasonable-ness challenge. After *Booker*, a district court must "first consult a properly calculated advisory Guidelines range and then, by reference to the factors specified in § 3553(a), select a sentence either inside or outside the advisory range." *See United States v. Walker*, 447 F.3d 999, 1007 (7th Cir. 2006). This is a distinction with a difference in our post-*Booker* world, since a sentence within the guideline range is presumptively reasonable, *see United States v. Owens*, 441 F.3d 486, 490 (7th Cir. 2006), while a sentence outside the guideline range requires more explanation based on the § 3553(a) factors, *see Walker*, 447 F.3d at 1007. The parties agreed at the sentencing hearing that without the acceptance of responsibility reduction the guidelines range would be 108-135 months and if acceptance of responsibility was counted, the range would drop to 78-97 months. Taking the district court at its word that the 118-month sentence applied with or without the acceptance of responsibility points, this sentence could be deemed either outside the guideline range or within. We will only examine the sentence as one outside the range since if the sentence survives this more searching review, it would obviously suffice if within the range (and presumptively reasonable).

The district court adequately explained the reasons for its sentence, examining the various § 3553(a) factors in detail. In particular, the district court mentioned the severity of the offenses, which defrauded victims of over one hundred million dollars. The offenses were not one-time affairs, but the long-term duping of the victims by flooding

---

[6] (...continued)
various positions, these arguments are moot.

them with a coordinated attack of falsehoods. Even more
troubling, Duff used and corrupted his employees and his
own family, particularly his mother and wife, to satisfy his
greed. Moreover, the district court also laid emphasis on
Duff's ready willingness to flout laws to gain his criminal
objectives and the apparent difficulty in deterring a man
who would engage in these types of dealings for over a
decade. The district court then assessed the nature and
circumstances of Duff's character, which further condemned
him. He acted out of avarice, not necessity, and, as became
clear at trial, threatened and bullied others to get his way.[7]
In short, the district court had a thoughtful and meaningful
analysis regarding why Duff's crimes merited 118 months
of imprisonment. Our review is deferential, as the district
court was in the best position to judge. *See Walker*, 447 F.3d
at 1008. The district court's evaluation gave a mountain of
reasons for a sentence outside the guidelines range, and we
find the sentence reasonable.

### E.

Duff finally argues that the district court's restitution
order in the amount of $10,933,016.02 for Chicago was
improper as Chicago did not lose any money under the
contracts. Again, we reject Duff's contention. We review the
amount of restitution for abuse of discretion. *See United*

---

[7] The trial provided a particularly insightful glance into Duff's
personality through the testimony of his own employees,
auditors, and clients, which demonstrated his willingness to
scream, bully, and threaten (including threats of harm against
another's family) to get his way.

*States v. Brierton*, 165 F.3d 1133, 1139 (7th Cir. 1999). The Mandatory Victims Restitution Act ("MVRA") provides that restitution will be ordered to any victim for "an offense against property under this title, including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA defines a victim as any person directly harmed by a defendant's criminal conduct in the course of a scheme, *see United States v. Belk*, 435 F.3d 817, 820 (7th Cir. 2006); 18 U.S.C. § 3663A(a)(2), and a government agency can be a victim for these purposes, *see United States v. Sapoznik* 161 F.3d 1117, 1121 (7th Cir. 1998). To calculate the restitution amount, the district court must determine the loss caused by the crime, which is the greater of (1) the value of the property on the date of the damage, loss, or destruction, or (2) the value of the property on the date of sentencing. *Belk*, 435 F.3d at 819; 18 U.S.C. § 3663A(b)(1)(B). The court then subtracts from that amount the value of any returned property. *Id*. Duff contends that since his companies performed the contracts, and performed them well, the companies returned full value to Chicago for its money and that restitution should not be required.[8]

Again, Duff misses the point. The contracts were not simply for cleaning and labor services but for rendering services by legitimate MBE/WBEs. While Duff's companies provided valuable cleaning services, they could not possibly return Chicago's property because they

---

[8]  Duff also suggests, without developing the argument, that it is in some way inequitable for a district court to order restitution and forfeiture in the same amount. While we recognize to the untrained eye, this might appear to be a "double dip," restitution and forfeiture serve different goals, and we have approved of this practice in the past. *See United States v. Emerson*, 128 F.3d 557, 566-67 (7th Cir. 1997).

could not achieve Chicago's desired goal of developing and sustaining an emerging minority business. As the government mentioned at oral argument, Chicago was not looking for the best deal possible on these contracts precisely because it wanted to give the money to nurture particular recipients—MBEs and WBEs. Therefore, performing the contract adequately did not provide the consideration for which Chicago bargained: it did not support the proper minority or women businesses.

The question then becomes whether the district court's restitution amount was a correct approximation of the difference between the services rendered and what the city anticipated from a contract with a proper MBE or WBE. We find some guidance from the *Sapoznik* case cited previously. Sapoznik was a suburban police chief who received $500 per month for four years from the Mafia to shield its gambling interest in his town. *See Sapoznik*, 161 F.3d at 1118. The district court ordered restitution to the town in the amount of one year's salary as police chief. *See id*. at 1121. We recognized that the town likely would have never hired Sapoznik had it known of his easy virtue, which would mean that it would not have paid him salary for any of his four years as chief. *Id*. However, we also understood that the town would not have saved the entire amount of his salary, as the government suggested, because "it would have hired an honest police chief and paid him the same." *Id*. After noting that most of his work was exemplary, we found that the restitution order, which generously credited Sapoznik for providing value to his employer for three-quarters of his salary despite his infidelity was proper. *Id*. at 1122. "Given the difficulty of estimating the loss that he actually imposed on the city (as opposed to the gain that he conferred on the gambling dens and the

Mafia), we think the district judge acted within the limits of her discretion." *Id*.

In the present case, we confront a similar situation in which the actual loss to Chicago from not enlisting a true MBE or WBE for these contracts is inherently difficult to quantify. Faced with this situation, we determine that the loss amount calculated by the district court, which effectively credits the Duff companies as being worth to Chicago approximately 90% of a proper MBE/WBE, is a generous credit in favor of Duff. Given the wide latitude we afford a district court in this situation, we conclude that the district court did not abuse its discretion when calculating the restitution amount.

## LEAHY'S TRIAL AND SENTENCING ISSUES

### F.

We now address the issues arising from Leahy's trial and sentencing. First among these is his belief that the government did not produce sufficient evidence to convict him of mail and wire fraud in connection with the insurance scheme. Closely tied to this assertion is Leahy's theory that, given the paucity of the evidence against him, the district court should not have given an ostrich instruction, which allowed the jury to convict him despite the insufficient evidence.

Turning first to the sufficiency of the evidence, Leahy, like all such challengers, carries a heavy burden. We view the evidence in the light most favorable to the prosecution. *See United States v. Tadros*, 310 F.3d 999, 1005-06 (7th Cir. 2002). We find the evidence insufficient only if no rational trier of fact could have found guilt beyond a reasonable doubt. *See id.* at 1006. As Leahy was convicted of multiple counts of

mail and wire fraud arising out of the insurance scheme, we examine any evidence of a scheme to defraud, an intent to defraud, and use of mails and wire to further it. *See United States v. Seward*, 272 F.3d 831, 835 (7th Cir. 2001).

Even looking at the evidence in the light most favorable to the government, this is a relatively close case. The 1999 telephone call about the Kemper notice of cancellation, together with the circumstances surrounding this call, were the strongest pieces of evidence tying Leahy to the scheme. As discussed previously, Windy Labor received a notice of cancellation from Kemper, its insurer, for failure to complete an audit. Martinez, the Windy Labor employee who worked most closely on the insurance fraud, turned to Duff. For his part, Duff commanded Martinez to call Leahy. During the conference call, Leahy exhibited knowledge that Kemper wanted to cancel the policy based on an inability to complete its audit. He did not react with surprise. Rather, he suggested that Windy Labor had to do whatever necessary to obtain insurance. When Placek expressed her feeling that they were perpetrating insurance fraud, Leahy did not disagree. There was simply silence, eventually broken by Leahy, who reiterated his feeling that the options were either do whatever needed to be done or have no insurance. Taking the evidence in the light most favorable to the government, it seems unlikely that Duff would involve Leahy in such a sensitive matter unless Leahy knew about the scheme. Moreover, the testimony about this phone call shows Leahy was aware of the problems with the audit and felt that anything, including insurance fraud, was authorized to defuse the potential bomb. This is strong evidence of Leahy's involvement.

However, this was not the only evidence suggesting Leahy's role in the insurance scheme. The Windy Labor

account was a haven of red flags that would be obvious to anyone familiar with workers compensation insurance. At trial, multiple insurance witnesses testified that the experience modifier for Windy Labor in the 1990s was extremely high, which was a clear tip-off that there might be serious job misclassification. In fact, several of the witnesses, including a Kemper auditor with over twenty years of experience and Braband, the experienced insurance broker, stated that they had never come across a modifier that high. Besides the high experience modifiers, the loss-run information constituted another red flag. As explained previously, the loss runs showed the type of claims filed and the classification of the employees who filed them. The loss runs compiled for Windy Labor indicated that the injuries were occurring almost entirely in the labor categories and involved more employees than were actually in that category. This takes on particular significance considering that applications and policies sent to Leahy & Associates, and sometimes generated by Leahy & Associates, showed that the workforce was almost entirely clerical. Finally, insurance companies repeatedly issued notices of cancellation to Windy Labor, with copies to Leahy & Associates, for failure to properly complete the audits.

Taking the evidence in the light most favorable to the prosecution, these red flags are strong circumstantial evidence. While there is no direct evidence that Leahy looked at any of this information, he would have had to completely ignore this part of his business for the better part of a decade in order to miss it. Contradicting this possibility, Maribel Gomez, one of his employees, described Leahy at trial as hands-on boss who was aware of the happenings on the policies. The chance that he simply was not aware of the doings at his own company seems even more unlikely when one considers that it was Leahy, not

Wisniewski, who was Duff's connection at Leahy & Associates. Moreover, it seems most improbable that Wisniewski would cooperate in massive fraud for one of Leahy's family friends without Leahy having something to do with it. Bolstering this point was Leahy's willingness to protect Duff's fraud against Chicago by misleading the investigators regarding the true structure of Windy Maintenance. The evidence of the 1999 telephone conference, combined with numerous, significant red flags on the account and the circumstances suggesting his involvement, provide sufficient evidence to support the jury verdict.

This brings us to the propriety of the ostrich instruction, which assumes additional significance given the relatively thin evidence here. The ostrich—or deliberate avoidance—instruction is used to inform the jury that the legal definition of knowledge includes deliberate avoidance of knowledge. *United States v. Fallon*, 348 F.3d 248, 253 (7th Cir. 2003). The district court instructed the jury:

> Knowledge may be proved by the defendants' conduct and by all the facts and circumstances surrounding the case. You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly as I have used that word. You many not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

This instruction was nearly identical to the pattern Seventh Circuit jury instruction on this subject, *see United States v. Carrillo*, 435 F.3d 767, 779 (7th Cir. 2006), and Leahy does not argue that the formulation of the instruction

was error. Rather, Leahy argues that evidence is insufficient to support the ostrich instruction. We review the district court's decision to give this instruction for an abuse of discretion, viewing the evidence in the light most favorable to the government. *See United States v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999); *United States v. Trigg*, 119 F.3d 493, 504 (7th Cir. 1997).

The ostrich instruction is appropriate if a defendant claims a lack of guilty knowledge and the evidence supports an inference of deliberate avoidance. *See, e.g., Fallon*, 348 F.3d at 253. This second prong means that a defendant deliberately avoided acquiring knowledge of the crime being committed by cutting off his curiosity through an effort of the will. *Id*. Inherent in this instruction is the difficulty in distinguishing between the cutting off of one's curiosity and a simple lack of effort. *See Carrillo*, 435 F.3d at 780. The latter cannot be punished.

Leahy only attacks the second prong of the ostrich instruction requirements, contending that the evidence did not support an inference of deliberate avoidance but only showed a simple lack of effort. Taking the evidence in the light most favorable to the government, we cannot agree and do not believe that the district court abused its discretion when it gave this instruction. The evidence, while not overwhelming, offers several indications that Leahy hid his head in the sand regarding the insurance fraud. We briefly return to ground already ploughed in our sufficiency of the evidence discussion. During the Kemper cancellation discussion, Leahy asked no questions about the audit problems and did not even question the allegation that fraud might be involved. "[F]ailure to ask questions that would certainly arise from the circumstances . . . is evidence that could lead a jury to determine [the defendant] deliber-

ately avoided learning about the [ ] scam." *Craig*, 178 F.3d 897-98. As demonstrated above, Leahy would have been exposed to numerous red flags, obvious to someone with his training and experience, over the duration of his business relationship with Windy Labor. Contrast his claimed ignorance despite years of involvement with these accounts with the reaction of Braband, who immediately realized that the Windy Labor numbers were misclassified after a short review of the file. Taking the evidence in the light most favorable to the government, we cannot say that the evidence only shows a case of negligence. Rather, it shows repeated indications of deliberate avoidance by Leahy, and, given this conclusion, the inclusion of the ostrich instruction was appropriate.

## G.

We next turn our attention to Leahy's various evidentiary challenges. We review such claims for abuse of discretion. *See United States v. McGee*, 408 F.3d 966, 981 (7th Cir. 2005); *United States v. Anifowoshe*, 307 F.3d 643, 646 (7th Cir. 2002).

Leahy first contends that the testimony of Hiegel (the assistant state's attorney who investigated the city scheme) constituted prohibited propensity evidence. Federal Rule of Evidence 404(b) generally excludes the introduction of bad acts "to show that a defendant has a propensity to commit a crime and that he acted in accordance with that propensity on the occasion in question." *United States v. Chavis*, 429 F.3d 662, 667 (7th Cir. 2005). Bad acts evidence may be admitted, however, for other purposes, such as to show intent, knowledge, lack of mistake, motive, or opportunity. *See id*. We utilize a four-part standard to assess the admissibility of evidence under Rule 404(b):

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice.

*Anifowoshe*, 307 F.3d at 646.

Here, the district court properly admitted the evidence. Hiegel was investigating Windy Maintenance for fraud on the city relating to the WBE program when she discussed Green Duff's role with Leahy. Leahy falsely informed her that he exclusively met with Green Duff on insurance matters related to Windy Maintenance and he had nothing to do with Duff himself regarding Windy Maintenance. Leahy's description of the supposed structure of Windy Maintenance helped derail this investigation. Each of the Rule 404(b) requirements were met. This testimony demonstrated Leahy's intent to protect Duff and his fraudulent schemes, by showing his willingness to lie to investigators on Duff's behalf. Leahy's actions took place at the same time that the insurance fraud occurred and involved lies and subterfuge to throw off investigators, just as in the insurance fraud scheme. Moreover, the jury easily could have concluded that Leahy lied to Hiegel, and this was not such inflammatory evidence that the probative value was outweighed by its small prejudicial effect. The district court, therefore, did not abuse its discretion when it admitted this evidence.

Leahy also second-guesses the district court's refusal to admit certain pieces of evidence. Leahy wanted the

district court to admit a letter from a USF&G investigator to an FBI agent in which the investigator stated that she found no premium fraud by Windy Labor. The district court excluded the USF&G letter on hearsay grounds. The letter constitutes hearsay, but Leahy argues that it qualifies for a hearsay exception under Federal Rule of Evidence 804(b)(3). Under Rule 804(b)(3), the letter may be admissible if: (1) the declarant is unavailable; (2) the statement is against the declarant's penal interest; and (3) corroborating circumstances exist that bolster the statement's trustworthiness. Fed. R. Evid. 804(b)(3). Even assuming that the USF&G investigator was unavailable, Leahy cannot satisfy the second prong of this test. "A statement is against penal interest if it subjects the declarant to criminal liability." *United States v. Bonty*, 383 F.3d 575, 579 (7th Cir. 2004). The penal interest exception does not include statements that could possibly subject the declarant to prosecution. *See United States v. Butler*, 71 F.3d 243, 253 (7th Cir. 1995) ("The hearsay exception does not provide that any statement which 'possibly could' or 'maybe might' lead to criminal liability is admissible"); *see also Bonty*, 383 F.3d at 579 ("It is simply not enough that during the interview Bonty admitted to some facts . . . that 'possibly could' lead to criminal liability; to be inculpatory he must admit to criminal behavior."). Rather, the statement itself, taken as is, must basically admit to criminal behavior. *See Butler*, 71 F.3d at 253. In this case, the USF&G letter does not inculpate the author in any crime or subject her to liability, so the district court properly deemed it hearsay.

Moreover, Leahy believes the court abused its discretion by excluding certain audits from evidence. These audits were conducted by Travelers from 2001-2003, after the discovery of the insurance fraud scheme. Leahy thinks that they exculpate him because they show that Windy Labor

and Leahy & Associates were not responsible for any misclassification or insurance fraud once the Windy Labor schemers were removed. To be admissible, however, these documents must be relevant. Fed. R. Evid. 401 (relevant evidence is that "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") Just because Leahy did not continue with the fraud after the scheme had been discovered has no bearing on whether he participated before the fraud was out in the open. As such, the audits were properly excluded on relevancy grounds.

Leahy finally contends that he was denied his Sixth Amendment right of cross-examination because the district court would not allow him to use the USF&G letter when questioning the government's insurance experts. While the Sixth Amendment guarantees the right to confront witnesses, trial judges have broad discretion to impose reasonable limitations. *See United States v. McLee*, 436 F.3d 751, 761 (7th Cir. 2006). In this instance, the district court used its power to limit a portion of an examination that would rely on hearsay material of marginal relevance. Again, we find no abuse of discretion.

## H.

Having dealt with Leahy's complaints about the trial,[9] we move to his sentencing and restitution objections.

---

[9] Leahy made one additional trial complaint, that the district court erred when it denied his motion for severance. As he did not renew this motion at the close of the evidence, however, it was waived. *See United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002).

First, Leahy argues that the district court should not have applied U.S.S.G. § 3B1.1, an enhancement for being an organizer or leader in the insurance fraud. This is a factual determination and, as such, we review for clear error. *See United States v. Wasz*, 450 F.3d 720, 730 (7th Cir. 2006). Leahy specifically asserts that he did not control Wisniewski or give orders to anyone to further the fraud. This, however, was not required. "Organizers 'do not necessarily control anyone but nonetheless influence the criminal activity by coordinating its members.'" *United States v. Skoczen*, 405 F.3d 537, 550 (7th Cir. 2005) (quoting *United States v. Reneslacis*, 349 F.3d 412, 417 (7th Cir. 2003)). When the insurance scheme was faltering, Duff sent his underlings to Leahy, not Wisniewski, for the solution. Moreover, Leahy provided cover for the insurance fraud through his brokerage firm and employees. Leahy, therefore, marshaled the people and instruments for this offense, which is sufficient. *See id*. While there is not an abundance of information supporting this finding, we do not believe that the district court clearly erred in adding this upward enhancement.

Leahy's next challenge is to the district court's calculation of the offense level, which hinged on the district court's loss determination. Leahy contends that the district court should not have computed the amount of loss for the entire period from 1989 through the ending of the scheme. The definition of loss is a question of law subject to de novo review, while the amount of loss is a finding of fact reviewed for clear error. *See Vivit*, 214 F.3d at 914. According to U.S.S.G. § 1B1.3, application note 2, a defendant cannot be held accountable for acts that occur before he engaged in criminal conduct. *See Nichols v. United States*, 75 F.3d 1137, 1143-44 (7th Cir. 1996).

The district court erred in calculating loss based on the entirety of the scheme. While Leahy was the insurance broker at the very start of Windy Labor, no evidence indicated that either Leahy or Leahy & Associates became involved with the insurance scheme until 1995. Apparently acting alone, Windy Labor changed the classifications, thus reducing premiums. The government and district court assumed that Leahy would have known about the fraud because of the changes in the payroll classifications in the policies and his business and social interactions with Duff and his family. Before 1995, however, the policy was essentially self-renewing with no input from Leahy and his company. Moreover, by the time that the fraud would have been most obvious with high modifiers and drastically different payroll, the file had been transferred to Wisniewski, whom the district court found was not responsible for any pre-1995 losses. The district court assumed, unsupported by evidence, that Leahy actually was a participant in the fraud before 1995. This does not suffice. *See McIntosh*, 198 F.3d at 999 ("We will reverse [a factual] finding only if the record contains no evidence providing a foundation for it.").

This conclusion also affects our last inquiry, the restitution amount. Leahy challenges both the method used to calculate the restitution amount, as well as the period covered. The first is rather easily disposed of. As stated previously, we review the amount of restitution for abuse of discretion. *See Brierton*, 165 F.3d at 1139. The district court concluded the appropriate amount of restitution to the Insurance Council was $1.09 million, the total amount of the underpaid premiums. Leahy argues that the Insurance Council does not merit restitution because it received more in premiums than it paid out in claims, so it sustained no loss for restitution purposes. We disagree. The insurance companies were

entitled to the benefit of their bargains—the amount of money they would have charged to insure the actual risk that Windy Labor presented. *See United States v. Garavaglia*, 5 F. Supp. 2d 511, 520, 522 (E.D. Mich. 1998), *aff'd*, 178 F.3d 1297 (6th Cir. 1999). Otherwise, Windy Labor would obtain a windfall through its fraud, receiving coverage for greater risks than the amount of premiums merited. The district court, therefore, did not err in the restitution order when it calculated the entire amount Windy Labor should have paid and subtracted what it did pay. The remainder returns the insurance companies to the positions they would have occupied absent the fraud. However, the restitution amount imposed on Leahy must be reduced consistent with our earlier finding regarding the length of his criminal participation.

### III.

Duff used his associates to satiate his greed, taking advantage of a city's attempt to help minorities and women and abusing the trust of his insurers. The government properly indicted Duff, Stratton, Dolan, and Leahy for various crimes, including wire and mail fraud, and the district court, by and large, conducted the trial of these complex and extensive matters admirably. We AFFIRM the convictions of all the defendants and the district court's evidentiary rulings. We REVERSE the district court's conclusion regarding the extent of Leahy's involvement with the insurance fraud and REMAND for re-calculation of the offense level and restitution amount consistent with this opinion.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*