In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1320

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VAHAN KELERCHIAN,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:13-CR-66 — **Joseph S. Van Bokkelen**, *Judge.*

ARGUED APRIL 2, 2019 — DECIDED AUGUST 22, 2019

Before HAMILTON, BARRETT, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Federal law imposes tight restrictions on private possession of machineguns and laser gunsights but allows law enforcement agencies to purchase and use both machineguns and laser sights. This appeal concerns criminal conspiracies among a firearms dealer and law enforcement officers to fool manufacturers into thinking they were selling to local police forces when the machineguns and laser sights were instead going into private hands.

Defendant-appellant Vahan Kelerchian was a licensed firearms dealer. His co-conspirators were Joseph Kumstar, the Deputy Chief of the Lake County Sheriff's Department in Indiana, and Ronald Slusser, a patrolman who was the armorer for the department's SWAT team. The trio defrauded firearms manufacturer Heckler & Koch and the laser sight producer Insight Technologies into selling them machineguns and laser sights restricted by law for law enforcement and military use. After many fraudulent transactions, the three were indicted on several charges. Kumstar and Slusser pleaded guilty. Kelerchian went to trial and was convicted on four counts of conspiracy and four counts of making false writings. On appeal, Kelerchian raises numerous issues, but we affirm his convictions on all counts. In Parts I and II, we provide the factual and procedural background for Kelerchian's arguments. In Part III, we analyze his numerous challenges to his convictions.

I.  *Factual Background*

   A.  *Machineguns and Laser Sights*

Since enactment of the National Firearms Act of 1934, codified in the Internal Revenue Code as 26 U.S.C. § 5801 et seq. ("the 1934 Act"), federal law has forbidden the importation of machineguns, but with several exceptions. Two are relevant here. First, machineguns may be imported for use by state or federal departments or agencies, and second, machineguns may be imported "solely for use as a sample by a registered importer or registered dealer." 26 U.S.C. § 5844; see also 27 C.F.R. § 479.112. The conspirators here submitted fake documents to Heckler & Koch to take advantage of these two exceptions.

The Gun Control Act of 1968, as amended and codified as part of the criminal code in 18 U.S.C. § 921 et seq. ("the 1968 Act"), imposed additional restrictions on a much broader category of firearms, as well as new recordkeeping laws. The 1968 Act, as amended, prohibits the transfer or possession of machineguns made after 1986, except by a federal, state, or local agency. 18 U.S.C. § 922(o). Both the 1968 and 1934 Acts require importers and dealers of firearms to keep records related to their transactions. 18 U.S.C. § 923(g); 26 U.S.C. § 5843. Both Acts make it a crime to make false statements with respect to these records. 18 U.S.C. § 924(a)(1)(A); 26 U.S.C. § 5861(l). The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") administers the recordkeeping requirements and the exceptions.

Laser sights, on the other hand, are regulated by the Food and Drug Administration ("FDA") as part of its regulation of radiation-emitting devices. See 21 U.S.C. § 360ii. The powerful lasers on gunsights can cause eye damage, so federal law ordinarily requires them to be equipped with visible or audible warnings before and during use, as well as protective covers and key controls. 21 C.F.R. § 1040.10(f). They also must have labels warning of the risk of eye damage. 21 C.F.R. § 1040.10(g)(2)(iii).

The FDA may, however, grant exemptions or variances from these requirements, such as for police departments that might need to be able to use silent laser sights. 21 U.S.C. § 360oo(b); 21 C.F.R. § 1010.4(a). The FDA also requires accurate records for laser sales. Laser manufacturers must collect and preserve information that will enable the tracing of lasers sold to distributors or to dealers. 21 C.F.R. § 1002.30(b)(1); see also 21 U.S.C. § 360nn(f). Dealers and distributors must

"obtain such information as is necessary to identify and locate first purchasers" of lasers and forward this information "immediately to the appropriate manufacturer." 21 C.F.R. § 1002.40(a), (c).

B.  *The Conspiracies*

Vahan Kelerchian was a licensed firearms dealer who ran a business in Pennsylvania called Armament Services International, Inc., known as ASI. He met Lake County Sheriff patrolman Ronald Slusser at a Kentucky machinegun show some time in the early 2000s. A few years later at the same show, Slusser introduced Kelerchian to his supervisor, Joseph Kumstar, the Deputy Chief of the Lake County Sheriff's Department. According to Slusser, he and Kelerchian stayed in touch and did business together for the next several years.

At some point, Slusser told Kelerchian about an illegal arms deal in 2008 that Kumstar had instructed him to help with. Kumstar had acquired machineguns by claiming that they were for the Sheriff's Department, but then instructed Slusser to remove certain parts of these guns and to sell them over the internet for Kumstar's personal gain. Slusser testified that Kelerchian expressed interest in doing a similar deal with Kumstar and Slusser. The three then plotted the conspiracies that led to their convictions.

1.  *Machinegun Purchases*

The first part of the conspirators' plan was to purchase machineguns from international gun importer Heckler & Koch ("H&K") under the pretense that the weapons were for the Lake County Sheriff's Department. Kelerchian, Slusser, and Kumstar orchestrated three fraudulent machinegun purchases from H&K.

In the first transaction, in December 2008, Kelerchian, Kumstar, Slusser, and Slusser's cousin, Ed Kabella, ordered 50 machineguns for $83,026. Kumstar prepared paperwork saying falsely that the Sheriff's Department was purchasing all 50 machineguns. Kelerchian sent this paperwork to H&K, including statements on Sheriff's Department letterhead attesting that the weapons were for the exclusive use of Lake County law enforcement. H&K then filed ATF Form 6, asserting that it was importing 50 machineguns for the Lake County Sheriff's Department. ATF approved the transaction, and H&K sent the 50 machineguns to the Sheriff's Department.

Slusser then took the machineguns apart, separating the guns' lower receivers, which are the regulated portions of the weapons containing traceable serial numbers. The unregulated upper barrels of the guns were distributed among the conspirators according to how much money each had contributed to the purchase. The plan was to refurbish 15 of the regulated lower receivers into new guns using cheaper parts, and then to add these new weapons into the Sheriff's Department's armory. The 35 remaining lower receivers were to be destroyed. No machineguns ever made it to the Sheriff's Department, though. The conspirators sold the unregulated machinegun parts for a substantial profit. Slusser sold his unregulated machinegun barrels to a dealer named Adam Webber, who runs a website selling hard-to-acquire H&K machinegun parts.

Webber was involved in the next two machinegun purchases. He told Kumstar and Kelerchian that he was interested in buying additional machinegun parts. In February 2009, using the same procedure as before, Kumstar and Kelerchian bought nine H&K machineguns, again telling H&K

falsely that the guns were for the Sheriff's Department. Once the machineguns were delivered, Slusser again disassembled them and sent the unregulated parts to Webber. In exchange, and relevant to the money-laundering conspiracy charge, Webber sent Slusser a cashier's check for $18,900. At Kumstar's direction, Slusser deposited that check into his own account and then sent cashier's checks to both Kumstar and Kelerchian. Nine months later, Kelerchian mailed H&K a check for the machineguns.

In October 2009, Kelerchian and Kumstar bought twelve more machineguns from H&K, again telling H&K falsely that they were for the Sheriff's Department. Slusser again disassembled the guns and sent the unregulated parts to Webber. Webber mailed Slusser a $31,200 check, which he cashed. Slusser wrote Kelerchian a check for $28,200, and Kelerchian wrote H&K a check for the guns' $16,800 purchase price.

### 2. *Demonstration Letters*

In the meantime, the conspirators also used the exception for importing machineguns as demonstration samples for a dealer. Kumstar testified that Kelerchian asked him for help in buying machineguns for his personal collection. Between October 2007 and March 2010, Kumstar sent five letters to the ATF stating falsely that the Lake County Sheriff's Department was interested in demonstrations of the weapons Kelerchian wanted for himself. The letters said that Kelerchian had "offered to conduct such demonstration[s]" and "intend[ed] to demonstrate the operation, identification and safe handling of the guns" to provide "department personnel a better understanding of the capabilities, limitations and differences of these guns." Kumstar testified that neither he nor the Sheriff's Department was actually interested in demonstrations of the

requested machineguns and that he never had discussed a plan for conducting an actual demonstration with Kelerchian. Kumstar also testified that the weapons were not guns the Department would use.

Through this arrangement, Kelerchian was able to buy nine machineguns. He became the registered owner of these weapons, and federal law allowed him to sell them at his own discretion. No demonstrations ever occurred.

Kelerchian's testimony disputed Kumstar's account. He said that Kumstar had offered on his own to write the first dealer sales sample letter for Kelerchian and genuinely was interested in a demonstration. Kelerchian also testified that he offered to conduct demonstrations for Kumstar and the Department many times between October 2008 and April 2011. He said that he offered a variety of settings and dates but that Kumstar never took him up on his offers. The most Kumstar did, according to Kelerchian, was to come to Kelerchian's place of business, take photographs with guns, and pick up a gun, saying "We did our demo."

### 3. *Laser Sight Purchases*

Kelerchian, Kumstar, and Slusser also devised a plan to buy restricted laser sights from a company called Insight Technology. Slusser testified that he and Kelerchian wanted to buy laser sights for their personal collections. The devices Kelerchian and Slusser wanted did not comply with FDA safety rules requiring a visible or audible warning. However, the FDA had granted Insight Technology a variance allowing it to sell its laser sights (technically, Class IIIb devices) to federal, state, and local enforcement agencies on the theory that safety features like a visible or audible warning could

compromise stealth operations in which officers need to remain unheard and unseen.

Slusser and Kelerchian used the variance to buy laser sights on the pretext that they were for the Sheriff's Department. Kelerchian and Slusser told Kumstar which sights they wanted, and Kumstar then put together a purchase order with paperwork saying falsely that the Sheriff's Department was buying the lasers. In December 2008, Kelerchian sent Insight Technology this purchase order for 25 sights for $27,103.52. Using a nearly identical method, in March 2010, the three bought an additional 22 lasers sights for $30,249.92. According to Slusser, he and Kelerchian placed two more orders for Insight Technology laser sights by using a friend of Slusser's in the Lowell, Indiana Police Department in December 2009 and August 2010. The Lowell orders were for more than 28 Class IIIb laser products costing more than $32,000.

Kelerchian testified that he was unaware of the FDA's regulation of lasers and the variance. He told the jury that an Insight Technology employee named Linda Harms told him that the lasers could be sold to individuals if they went through a law enforcement department first. Harms testified at trial that she never would have told a customer that laser sights were available for individual purchase.

II.  *Procedural Background*

A federal grand jury returned a nine-count indictment. Count I alleged that, in buying the machineguns, Kelerchian, Kumstar, and Slusser violated 18 U.S.C. § 371 by conspiring to make false statements in records required by the 1968 Act. See 18 U.S.C. § 924(a)(1)(A). Count II alleged that, in buying the laser sights, Kelerchian and the others violated 18 U.S.C.

§ 371 by conspiring to defraud the FDA by interfering with its lawful government functions of limiting the sale of various restricted laser sights to military and law enforcement agencies and correctly identifying the buyers of restricted laser sights.

Counts III through VII focused on the demonstration letters. Count III charged Kelerchian under 18 U.S.C. § 371 with conspiring with Kumstar and others to violate 18 U.S.C. § 1001 by making false statements to the ATF in the phony demonstration letters. Counts IV through VII charged Kelerchian with actual violations of § 1001 in four separate letters.

Count VIII alleged that Kelerchian committed bribery by offering Kumstar a shotgun in exchange for his help with several of the fraudulent transactions. Count IX alleged that Kelerchian, Kumstar, and Slusser conspired to launder money in violation of both 18 U.S.C. § 1956 and § 1957. The § 1956 allegation concerned the second machinegun purchase and the § 1957 allegation concerned the third. The premise of Count IX is that the conspirators engaged in wire fraud in obtaining the machineguns and then laundered the proceeds of that fraud.

Slusser, Kumstar, and Kabella pleaded guilty and agreed to testify for the prosecution. Kelerchian took his case to trial. After the government rested and again after the close of all the evidence, Kelerchian moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on all counts. At both stages, the district court denied the motion on Counts I through VII and took the motion under advisement on Counts VIII and IX.

The jury found Kelerchian guilty on all counts except the bribery charge in Count VIII. Through a special verdict form, regarding Count II, the jury specifically found Kelerchian guilty of conspiring to interfere with both of the two regulatory functions of the FDA identified in the indictment. Through another special verdict form on Count IX, the jury found Kelerchian guilty of conspiring to launder money in violation of both 18 U.S.C. § 1956 and § 1957. Kelerchian was sentenced to 100 months in prison, plus a fine and term of supervised release.

III. *Legal Analysis*

Kelerchian challenges all of his convictions on a variety of grounds. First, he argues that Counts I and II failed to allege federal crimes. Second, he argues the government failed to prove the demonstration-letter charges in Counts III through VII and the money-laundering conspiracy in Count IX. Third, he contends the district court erred in its jury instructions. Finally, he claims the prosecution engaged in misconduct in its closing argument. We find no errors.

A.  *Legal Sufficiency of Counts I and II*

    1.  *Count I—Conspiracy to Violate Gun Control Act Recording Requirements*

Kelerchian argues that Counts I and II of the indictment fail to allege federal offenses. We start with Count I, which charged Kelerchian under 18 U.S.C. § 371 with conspiring to violate 18 U.S.C. § 924(a)(1)(A), which makes it a crime to knowingly make "any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter," including federally licensed firearms importers, manufacturers, and

dealers, including H&K. See *Abramski v. United States*, 573 U.S. 169, 174–75 (2014). "This chapter" is chapter 44 of Title 18, and it provides in relevant part that licensees may not sell "any firearm … to any person unless the licensee notes in his records, required to be kept pursuant to section 923 of this chapter, the name, age, and place of residence of such person … or the identity … of such … corporation or other business entity." 18 U.S.C. § 922(b)(5). "Person" in this case means the real buyer or intended recipient of the firearm, not a nominal or straw purchaser. *Abramski*, 573 U.S. at 179–82. Regulations implementing the 1968 Act also require licensees like H&K to "maintain permanent records of the importation … of firearms, including ATF Forms 6 and 6A." 27 C.F.R. § 478.129(d). Count I thus alleged a conspiracy to violate § 924(a)(1) by leading H&K to create false records for the machinegun purchases—falsely identifying the Lake County Sheriff's Department as the buyer. On this logic, Count I alleged a federal offense.

To avoid this conclusion, Kelerchian argues that 18 U.S.C. § 924(a)(1)(A) and the 1968 Act's regulations in 27 C.F.R. § 478 do not apply generally to machineguns. He argues that the 1934 Act regulates purchase, possession, importation, registration, and recordkeeping for machineguns, and that the only provision of the 1968 Act that applies to machineguns is 18 U.S.C. § 922(o), which criminalizes the transfer and possession of machineguns, but which was not charged in Count I.

Kelerchian bases his statutory argument on the two Acts' different definitions of the term "firearm." The 1934 Act provides: "The term 'firearm' means" a number of categories of especially dangerous weapons, including short-barreled shotguns and rifles, and specifically including "a machinegun." 26

U.S.C. § 5845(a). By contrast, the 1968 Act defines a "firearm" in relevant part much more broadly as "any weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). Comparing these definitions, Kelerchian argues that because the 1968 Act's definition does not expressly include machineguns, unlike the 1934 Act's definition, Congress meant to distinguish between machineguns and firearms in the 1968 Act, leaving machinegun regulation largely to the 1934 Act.

Based on both the text and the structure of the 1968 Act, we reject this argument. First, a machinegun clearly fits into the 1968 Act's broad definition of a "firearm" as a weapon that "will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). Machineguns are a subset of "firearms" as defined in the 1968 Act.[1]

Second, other provisions of the 1968 Act show that machineguns are properly treated as a subset of firearms under that Act. For example, § 924(c)(1) punishes the possession of a firearm during the commission of a crime of violence or a drug trafficking offense, but § 924(c)(1)(B)(ii) enhances the

---

[1] In the 1934 Act, the term "'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b). The 1968 Act borrows the same definition for the term where it is used in the 1968 Act. 18 U.S.C. § 921(a)(23).

punishment "if the firearm possessed … is a machinegun." Similarly, § 924(c)(1)(C)(ii) imposes a more severe penalty for a second § 924(c) conviction "if the firearm involved is a machinegun." Section 925(d) provides the Attorney General with authority over importation of firearms into the United States and possession of "unserviceable firearm[s], *other than* … machinegun[s]." 18 U.S.C. § 925(d) (emphasis added). The 1968 Act also grants qualified law enforcement officers with the proper identification the ability to carry concealed firearms, but specifically excludes machineguns from the definition of firearm for purposes of just that section. 18 U.S.C. § 926B(e). The clear implication is that all other provisions of the Act without such a limit apply to machineguns as a subset of firearms.

Accordingly, a machinegun counts as a firearm for purposes of 18 U.S.C. § 924, so Count I properly charged Kelerchian with conspiracy to violate the 1968 Act by submitting documents falsely telling H&K that the buyer of all the machineguns would be the Lake County Sheriff's Department.

### 2. *Count II—Conspiracy to Defraud the FDA*

Section 371 of Title 18 of the United States Code makes it a crime not only to conspire to commit "any offense against the United States," but also to conspire "to defraud the United States, or any agency thereof in any manner or for any purpose." The Supreme Court has "stated repeatedly that the fraud covered by the statute reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Tanner v. United States*, 483 U.S. 107, 128 (1987) (internal quotation marks omitted) (collecting cases). Count II charged Kelerchian with violating § 371 by conspiring to defraud the FDA in carrying out

its regulatory responsibilities. Kelerchian argues that Count II charged him with violating only FDA *policy* as opposed to any statute or regulation with the force of law. He emphasizes the text of the indictment charging him with conspiring to defraud the FDA by interfering with and obstructing the lawful functions of the FDA to:

    a. Limit the sale of various restricted laser aiming sight devices to the military and law enforcement agencies only;

    b. Correctly identify first line purchasers of various laser aiming sight devices which were restricted to military or law enforcement agency purchasers only.

As Kelerchian sees the case, no law or regulation restricts laser device sales to law enforcement, so he was charged with conspiring to violate only the variance the FDA granted Insight Technology to sell otherwise-illegal laser sights to law enforcement. Because this variance, Kelerchian continues, was not adopted in accordance with the Administrative Procedure Act, it has no force of law and cannot be used to bind third parties or to support criminal charges against them.

The argument misreads the indictment. Count II did not charge Kelerchian with conspiring to violate the variance but with conspiring to defraud the FDA, rendering his Administrative Procedure Act argument irrelevant. Section 371 makes it a crime to defraud an agency of the United States "in any manner or for any purpose." The indictment alleged that Kelerchian, Kumstar, and Slusser conspired to defraud the FDA by obstructing the agency's ability to perform the two listed regulatory functions. Federal law provides the FDA

with the authority to regulate the sale of laser devices. See 21 U.S.C. § 360ii. In carrying out its regulatory function, the FDA promulgated safety and performance standards for laser sights. 21 C.F.R. § 1040.10. Manufacturers are barred from selling products that do not comply with the standards the agency sets. 21 U.S.C. § 360oo(a). That prohibition is in place unless a valid variance applies to a sale. § 360oo(b).

The variance is not a regulation, but as the indictment recognizes, granting these variances is an exercise of the FDA's regulatory function over laser products. By deceiving Insight Technology into selling them non-compliant laser sights, Kelerchian and the other conspirators defrauded the FDA into allowing them to possess devices that federal law prohibits. They also led Insight to create a false paper trail for these devices that would make it impossible for the FDA to keep track of the true owners of these dangerous products, which the FDA is supposed to do. Such fraud impairs the ability of the FDA to regulate laser devices to prevent harm to the public.

In *United States v. F.J. Vollmer & Co.*, 1 F.3d 1511 (7th Cir. 1993), we rejected an argument similar to Kelerchian's. At issue in *F.J. Vollmer* was a settlement agreement reached between the ATF and Gun South, Inc., a firearms importer. The settlement agreement allowed Gun South to sell an otherwise-banned semi-automatic rifle only to law enforcement officers or agencies. *Id.* at 1514. Kenneth Nevius, a captain on active duty in the Illinois National Guard, took advantage of this exception and bought two restricted rifles using his National Guard stationery. He said he was buying the weapons "in connection with his official duties and not for the purpose of resale." *Id.* He lied. He actually bought the guns to sell them

to F.J. Vollmer & Company, a firearms dealer. Nevius orchestrated several such deals. Nevius and F.J. Vollmer were indicted. The company was convicted of mail fraud and conspiracy to defraud the United States government.

On appeal, the company argued that it was charged with conspiring to violate only the settlement agreement between the ATF and Gun South, which was being treated as if it were a "*de facto* substantive agency rule." *Id.* at 1516. We rejected the argument, explaining that "F.J. Vollmer and Nevius were not convicted of violating a settlement agreement." *Id.* at 1515. "The indictment … specifically stated the elements" of a § 371 conspiracy, making it evident to the court that this was the federal crime the defendants were charged with committing. *Id.* at 1515–16. "Further," we continued, "because the convictions are not based on the violation of the settlement agreement, the defendants' [APA] argument … is irrelevant." *Id*. at 1516. We apply the same reasoning here. Count II properly charged Kelerchian with a violation of 18 U.S.C. § 371.

B.  *Sufficiency of Evidence*

Kelerchian next argues that the government failed to prove the charges involving the so-called demonstration letters that enabled Kelerchian to buy machineguns for his personal collection (Counts III through VII) and failed to prove the money-laundering conspiracy charge (Count IX). On its own initiative or upon a defendant's motion, a trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29 (a).

We review *de novo* the denial of a defendant's motion for acquittal, considering the evidence in the light most favorable

to the prosecution. *United States v. Mohamed*, 759 F.3d 798, 803 (7th Cir. 2014). We "ask whether any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt," *United States v. Foley*, 740 F.3d 1079, 1083 (7th Cir. 2014) (internal quotation marks omitted), and "overturn a verdict only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999) (internal quotation marks omitted). This is usually a high hurdle for a defendant to clear, but "the height of the hurdle depends directly on the strength of the government's evidence." *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019) (reversing denial of Rule 29 motion), quoting *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013) (affirming grant of Rule 29 motion).

### 1. *Demonstration Letters*

Kelerchian argues that the evidence does not support his convictions for conspiring to make false statements and making false statements in the demonstration letters submitted to ATF. To recap, Count III alleged that Kelerchian violated 18 U.S.C. § 371 by conspiring with Kumstar and Slusser to make false statements to the ATF by submitting letters falsely claiming that the Sheriff's Department wanted demonstrations of otherwise-prohibited weapons that Kelerchian wanted for his personal collection. Counts IV through VII alleged that the phony demonstration letters were false statements to the ATF in violation of 18 U.S.C. § 1001.

Kelerchian bases his argument on narrow readings of the text of the demonstration letters as compared to the indictment. He reads the indictment narrowly to charge him with conspiring to make and making *specific* false

statements—requests for demonstrations of machineguns. Nowhere in the essentially identical demonstration letters, Kelerchian contends, however, is there specific language, false or otherwise, actually requesting a demonstration. Because the indictment charged Kelerchian not with conspiring to make and making *any* false statement to the ATF but with conspiring to make and making *specific* false statements to the ATF, the government was required to produce evidence showing that the specific false statements were in fact made and failed to do so. We disagree.

The letters said the Sheriff's Department was "interested in a demonstration" of several listed guns and had found a dealer, Kelerchian, who had "offered to conduct such a demonstration." The letters explained that the "demonstration[s] will give [the] department personnel a better understanding of the capabilities, limitations, and differences of these [requested] guns." From the content of these letters, a reasonable jury could find that these were false requests for demonstrations. The letters could have had no other purpose. In addition, Kelerchian's own testimony characterized the letters as a "request to demonstrate" machineguns. Kumstar also testified that each of the letters was "a demonstration request," that Kelerchian had not offered demonstrations, and that the Sheriff's Department was not really interested in any. In short, there was sufficient evidence to support Kelerchian's convictions for conspiring to make and actually making false statements in the demonstration letters that he and his co-conspirators drafted.

   2.  *Money-Laundering Conspiracy*

Kelerchian's challenge to his conviction for conspiring to commit money laundering poses the closest question in this

appeal. The money-laundering conspiracy charge stems from the conspirators' second and third fraudulent machinegun purchases. The indictment charged Kelerchian with conspiring to launder money in violation of 18 U.S.C. § 1956(h), which makes it a crime to conspire to commit any of the money-laundering offenses defined in § 1956 or § 1957.

The indictment specified that Kelerchian conspired to violate this statute in two ways. First was a conspiracy to engage in a financial transaction using the known proceeds of an unlawful activity (wire fraud to obtain the machineguns) to conceal the ownership and control of the proceeds from the specified unlawful activity in violation of § 1956(a)(1)(B)(i). Second was a conspiracy to use the proceeds of the wire fraud to engage in a monetary transaction exceeding $10,000 in violation of § 1957. The jury found Kelerchian guilty of both alleged conspiracies. We focus on the conspiracy to violate § 1957, which we find was proven, so we need not address the theory under § 1956(a)(1)(B)(i). See *United States v. Joshua*, 648 F.3d 547, 553 (7th Cir. 2011).

A money-laundering violation under either § 1956 or § 1957 requires proof of two distinct acts: the unlawful activity that generated "proceeds" and then the monetary transaction conducted with the criminal proceeds. *United States v. Seward*, 272 F.3d 831, 836 (7th Cir. 2001), quoting *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998). The underlying unlawful activity here was wire fraud. "To establish wire fraud under 18 U.S.C. § 1343, the government must prove the defendant (1) participated in a scheme to defraud, (2) intended to defraud, and (3) used interstate wires in furtherance of the fraud." *United States v. Buncich*, 926 F.3d 361, 366 (7th Cir. 2019). The wire fraud offense was completed during the

second and third machinegun transactions when Kelerchian and the others sent materially false statements to H&K asserting that the machineguns were being purchased by the Lake County Sheriff. See *United States v. Aslan*, 644 F.3d 526, 545–46 (7th Cir. 2011) (wire fraud statute "punishes the scheme, not its success") (collecting cases); accord, e.g., *United States v. Kennedy*, 707 F.3d 558, 566–67 (5th Cir. 2013) (wire fraud distinct from money laundering of proceeds); *United States v. Halstead*, 634 F.3d 270, 280–81 (4th Cir. 2011) (health care fraud distinct from money laundering of proceeds). The machineguns were the proceeds of that wire fraud. According to the government, the way in which Kelerchian and Kumstar sold these weapons to dealer Adam Webber constituted money laundering.

The government's theories for the money-laundering conspiracy are that, after completing the fraud in the second purchase of machineguns, Kelerchian and Kumstar conspired to conceal the fact that machinegun parts were intended for dealer Adam Webber in violation of § 1956(a)(1)(B)(i) and conspired to engage in one or more transactions in criminally derived proceeds worth more than $10,000 in violation of § 1957. Kelerchian and Kumstar used Slusser as a middleman in their dealings with Webber to obscure the true ownership of the guns. In particular, Slusser sold the parts to Webber for $18,900 and received a check in his name as payment. He was instructed to deposit that check in his own account and then to issue cashier's checks to Kelerchian and Kumstar for $9,450 each. Kelerchian then waited nine months before paying H&K for the weapons. The intention, the government argued, was to make it appear as though the Sheriff's Department bought and retained control over the weapons. Further, Kelerchian waited months to pay H&K to distance himself from the

Webber sale, making it look as though he was unaware of the
connection between the money sent to H&K and the check he
received from Slusser. The wire fraud theory thus holds to-
gether.

But the government's explanation of its theory raised a
new issue in the law of wire fraud. The government must
show that the scheme to defraud was aimed at some form of
money or property. *Cleveland v. United States*, 531 U.S. 12, 19
(2000).[2] In his opening appellate brief, Kelerchian argued that
the wire fraud the government alleged was not a transaction
distinct from the sale of the fraudulently obtained
machinegun parts to Webber. The government responded
that the wire fraud was complete as soon as the defendants
sent the purchase packets with fraudulent statements to
H&K, so that the later sale of the parts was a distinct offense.
We agree with that point, but Kelerchian argued in his reply
brief that the government's solution to the distinct-transaction
problem posed a different fatal problem for the money-
laundering conspiracy charge. Submitting the fraudulent
statements to H&K to obtain the machineguns, Kelerchian
argued, did not amount to wire fraud because Kelerchian and
his co-conspirators did not deprive anyone of a "property
interest" as required under *Cleveland*.

This property interest issue takes us to the edges of federal
mail and wire fraud law and poses Kelerchian's strongest

---

[2] Although *Cleveland* and other Supreme Court cases establishing this
rule involve the mail fraud statute, 18 U.S.C. § 1341, as opposed to the wire
fraud statute, we have explained that "the elements of wire fraud under
18 U.S.C. § 1343 directly parallel those of the mail fraud statute" so that
"cases construing one are equally applicable to the other." *United States v.
Leahy*, 464 F.3d 773, 786 (7th Cir. 2006).

challenge to any of his convictions. In *McNally v. United States*, the Supreme Court explained that the federal mail fraud statute is "limited in scope to the protection of property rights." 483 U.S. 350, 360 (1987), *superseded by statute on other grounds*, 18 U.S.C. § 1346. To establish mail fraud, the government thus must "prove as an element of the offense … that the defendant deprived the victim of a property right." *United States v. F.J. Vollmer & Co.*, 1 F.3d 1511, 1520 (7th Cir. 1993), citing *McNally*, 483 U.S. at 359–61. Kelerchian argues that the government failed to identify a victim whom the defendants intended to deprive of a recognized property interest. He argues that neither the ATF's regulatory interest in the transfer of firearms nor H&K's interest in the legal disposition of its guns qualifies. The government's interest will not suffice, but H&K's interests will support the wire fraud theory.

As discussed above, *F.J. Vollmer & Co.* involved a scam in which an Illinois National Guard captain, Kenneth Nevius, defrauded a weapons manufacturer into selling him restricted guns under the pretense that he was purchasing the weapons "in connection with" his official duties. 1 F.3d at 1514. Nevius then resold the weapons to F.J. Vollmer & Company, a business dealing in the sale of firearms. *Id.* at 1513–14. Nevius and F.J. Vollmer were convicted of mail fraud in violation of § 1341. F.J. Vollmer argued that the mail fraud charge was insufficient because it "did not allege that the government had a property interest in the guns as is required by *McNally*." *Id.* at 1520. As in this case, at F.J. Vollmer's trial "the government did not allege in the indictment, present evidence at trial, nor was the jury instructed on the deprivation of a property right." *Id.*

We agreed with F.J. Vollmer, concluding that the government was not deprived of a qualifying property interest. *Vollmer*, 1 F.3d at 1521. The government argued that its "right to control the disposition of … firearms is a property interest" of which Nevius and F.J. Vollmer deprived it through mail fraud. We rejected this argument, holding that "the government's *regulatory interests* are not protected by the mail fraud statute." *Id.* (emphasis added), citing, among other cases, *United States v. Bruchhausen*, 977 F.2d 464 (9th Cir. 1992).

We conclude here, however, that the government proved that Kelerchian and his co-conspirators committed wire fraud against H&K, which had a sufficient property interest of which they schemed to deprive it. Kelerchian finds support for his position, though, in the Ninth Circuit's *Bruchhausen* decision. We consider first that case and then decisions of this court and the Second Circuit that adopt a broader view of property interests when parties are induced to enter into illegal sales, especially of weapons.

In *Bruchhausen*, the defendant was charged with a scheme to defraud American manufacturers by buying sophisticated technology, promising falsely that the purchased equipment would be used only in the United States, and then smuggling the goods to countries in the Soviet Bloc. "Representatives from these companies testified that they would never have sold to Bruchhausen had they known the truth." 977 F.2d at 466. On appeal the Ninth Circuit held that Bruchhausen had not defrauded the manufacturers of "property interests" within the meaning of the wire fraud statute. The court reasoned: "The manufacturers received the full sale price for their products," and "While they may have been deceived into entering sales that they had the right to refuse, their

actual loss was in control over the destination of their products after sale." *Id.* at 467. The Ninth Circuit wrote that while "the manufacturer may have an interest in assuring that its products are not ultimately shipped in violation of law … that interest in the disposition of goods it no longer owns is not easily characterized as property." *Id.* at 468. Accordingly, the court held "that the interest of the manufacturers in seeing that the products they sold were not shipped to the Soviet Bloc in violation of federal law is not 'property' of the kind Congress intended to reach in the wire fraud statute." *Id.*

If that view were correct, then it would be difficult to affirm Kelerchian's money-laundering conspiracy conviction. *Bruchhausen* is not the final word on the issue, however. The government's Rule 28(j) letter cited cases from this circuit and the Second Circuit that support its view that Kelerchian and the others defrauded H&K of a property interest sufficient to allow use of wire fraud as "unlawful activity" to support Kelerchian's money-laundering conspiracy conviction, and that view is consistent with the way the jury instructions and the government's closing argument framed Count IX for the jury at trial.

We start with *United States v. Leahy*, 464 F.3d 773 (7th Cir. 2006), in which defendant Duff was convicted of defrauding the City of Chicago. A Chicago ordinance required the city to establish a goal of awarding not less than 25% of the annual dollar value of all city contracts to qualified minority-owned businesses and 5% of the annual dollar value to qualified women-owned businesses, and set aside certain contracts for such businesses. *Id.* at 778. To take fraudulent advantage of the ordinance, Duff, a white man, obscured the ownership and control of two of his businesses to give the city the false

impression that his mother and a black man were running them. *Id.* at 779–81. Through this fraud, Duff was able to win lucrative contacts with the city. Duff and others were eventually convicted of wire fraud, in addition to other offenses. The defendants appealed, arguing that the indictment could not support a conviction under the applicable mail and wire fraud statutes because "the only loss Chicago suffered was to its regulatory interests—an intangible right unprotected by these statutes." *Id.* at 786.

We rejected that argument. We noted that the object of the wire fraud was in fact property—money paid under contracts. *Id.* at 787–88. We distinguished *Cleveland*, where the Supreme Court held that for mail-fraud purposes, Louisiana did not have a property interest in state permits or licenses it issued for video poker machines. See 531 U.S. at 21–23. Unlike the fraud to obtain the licenses in *Cleveland*, in *Leahy* "the fraud was committed both against Chicago as a regulator and also against the city as a property holder." 464 F.3d at 788. This "scheme precisely and directly targeted Chicago's coffers and its position as a contracting party." *Id.* We concluded that Chicago suffered a property loss "in that it paid for a service provided by [a minority-owned business] or [women-owned business] that it did not receive." *Id.* We affirmed the mail and wire fraud convictions.

*Leahy* is not precisely on point—the fraud there was aimed at the buyer, not the seller, of products and services—but it is instructive. First, in both cases, the object of the fraud was property—money in *Leahy* and here machineguns. Second, in both cases one party to a contract deceived the other to induce it to enter into the contract. In *Leahy* the city was deceived into contracting with businesses controlled by Duff rather than by

minorities or women, as the ordinance called for. Here, H&K was induced to sell machineguns to a buyer it thought was lawful (the Sheriff's Department) when the real buyers were the defendants, who could not lawfully buy the machineguns. Kelerchian's fraud deprived H&K of the ability to ensure that its products were sold in compliance with federal law. As Kelerchian points out, H&K was paid the full price for the machineguns. In *Leahy*, too, however, the city received the services it paid for, yet not from the sorts of businesses it thought it was paying for them. 464 F.3d at 788. We treated that sort of loss as sufficient, noting that the object of the fraud "was money, plain and simple, taken under false pretenses from the city its role as a purchaser of services." *Id.*

The government also finds support from Second Circuit cases. In *United States v. Schwartz*, the defendants purchased night-vision equipment from Litton Industries. 924 F.2d 410 (2d Cir. 1991). The Arms Export Control Act restricted the sale of this equipment to certain countries (including Argentina, then fighting the United Kingdom in the Falklands War), so Litton sought assurances that the defendants would not export purchased equipment to restricted countries. *Id.* at 414. The sales contracts required the buyers to assure that they would comply "with all laws and regulations pertaining to the export of night vision goggles." *Id.* As the defendants placed additional orders, Litton sought further assurances and documentation that the equipment was not destined for restricted countries. The defendants signed the contracts and promised to abide by applicable laws but then exported regulated night-vision goggles to Argentina, where they were used against British forces. *Id.* The defendants were convicted of wire fraud, among other crimes. *Id.* at 420.

In challenging their wire fraud convictions for the Argentine sales, the defendants argued that Litton did not suffer any economic harm and thus could identify no qualifying property interest. *Id.* The Second Circuit upheld the convictions because the defendants' "misrepresentations went to an essential element of the bargain between the parties and were not simply fraudulent inducements to gain access to Litton equipment." *Id.* at 421. The court explained that "the fact that Litton was paid for its night vision goggles does not mean that Litton received all it bargained for. In fact, it did not." *Id.* The "defendants' conduct deprived Litton of the right to define the terms for the sale of its property … and cost it, as well, good will because equipment Litton … sold was exported illegally." *Id.*

In later cases, the Second Circuit has clarified the test it applied in *Schwartz*. The court has acknowledged that "[t]he 'right to control one's assets' does not render every transaction induced by deceit actionable under the mail and wire fraud statutes." *United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015), quoting *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991). Its "cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *Id.*, quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). This is a fine distinction, but Kelerchian and his co-conspirators fell on the wrong side of it, as the defendants in *Schwartz* did with their fraud to obtain arms for illegal export.

In *Shellef*, for example, the defendants persuaded a company to sell them hundreds of thousands of pounds of a highly regulated chemical by falsely representing that they would not resell the solvent within the United States. 507 F.3d at 89–90. The court distinguished *Schwartz* by focusing on the different misrepresentations made in the cases. In *Shellef*, the misrepresentations induced the seller only "to enter into a transaction it would otherwise have avoided," whereas in *Schwartz*, the defendants had misrepresented "an essential element of the bargain." *Id.* at 109, quoting *Schwartz*, 924 F.2d at 421. In explaining this distinction further, the Second Circuit later said that it "reject[s] application of the mail and wire fraud statute where the purported victim received the full economic benefit of its bargain," and upholds "convictions … where the deceit affected or the victim's economic calculus or the benefits and burdens of the agreement." *Binday*, 804 F.3d at 570.

The Second Circuit opinions and our opinion in *Leahy* show that schemes to defraud a party into entering a contract it would not enter if it had been told the truth, but where the fraudsters deliver the agreed money, goods, or services are close to the edge of the reach of the wire and mail fraud statutes. We do not attempt here, in this money-laundering conspiracy case, to establish a comprehensive guide on the scope of the mail and wire fraud statutes. We concentrate on the case before us, focused on illegal imports of highly regulated and dangerous machineguns. On the strength of our decision in *Leahy* and the Second Circuit's in *Schwartz*, which is remarkably close to our facts and persuasive, we conclude that the government proved that the scheme to defraud H&K involved a sufficient property interest to

support using wire fraud as the underlying unlawful activity for a money-laundering conspiracy charge.

As in *Leahy*, the scheme to defraud induced one party here to contract with others who were not legally entitled to enter into the contract. And as in *Schwartz*, this case involves much more than the seller's preferences about the terms of the deals. As in *Schwartz*, an arms manufacturer was defrauded into making a sale to buyers who were legally prohibited from buying the goods. We agree with the Second Circuit's explanation in *Schwartz* that, in such a deal, the fact that the seller was paid full price does not mean it received all it bargained for and is not decisive. The *Bruchhausen* view fails to take into account the damage to goodwill from the illegal sale and, we add, the legal and regulatory risk that the seller faces in such deals. If Litton (in *Schwartz*) and H&K (here) had known the true facts of the sales, those companies would have faced criminal liability. Even the investigation of the criminal transactions posed costs and legal risks for the sellers.

In the language of the Second Circuit, the destination of the machineguns—a law enforcement agency—was an "essential element of the bargain" between H&K and the supposed buyer. Without the Sheriff's Department stationery, Kelerchian and the others could not even have approached H&K about buying these machineguns. The sale *required* submitting the ATF forms and an application certifying that the purchaser of the guns was a law enforcement agency. Although H&K did not lose any money in the machinegun transaction itself, by illegally selling firearms it opened itself up to risks it did not bargain for: risks of liability, of increased government scrutiny, and negative publicity, all of which in turn could jeopardize future sales. These are serious

repercussions central to H&K's calculus of the "benefits and burdens" of this transaction.

Comparing the Ninth Circuit's decision in *Bruchhausen* with the Second Circuit's decisions in *Schwartz* and its progeny, we think the Second Circuit has the better reading of the mail and wire fraud statutes. Although "property" in these statutes is not broad enough to encompass intangible interests like government regulatory interests, "property" is not so narrow as to exclude any tangible good or service for which fair market value is paid. In *Bruchhausen*, the Ninth Circuit rejected the idea that a seller could have a cognizable property interest "in assuring that its products are not ultimately shipped in violation of law" because that would mean the manufacturer's interest is "in the disposition of goods it no longer owns." 977 F.2d at 468. We respectfully disagree. The seller's interest is not only in *shipping* goods legally, but also in not *selling* products in violation of federal law. That interest exists before the seller relinquishes ownership. As the concurrence in *Bruchhausen* explained: "The strictures an owner puts on his willingness to sell an item are not mere ephemera. When a prospective buyer lies in order to evade those strictures, a fraud has been committed upon the owner of the item just as surely as if the buyer had issued a rubber check." *Id*. at 469 (Fernandez, J., concurring).

H&K sold the machineguns to Kelerchian and his co-conspirators only because of their deceit. Because this fraud deprived H&K of a cognizable property interest in avoiding illegal sales of its products, the government established a violation of § 1343. This is as far as we need to go to affirm Kelerchian's conviction on conspiracy to launder money in violation of § 1957.

Kelerchian also argues that the government failed to prove that he conspired "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of" the wire fraud in the second machinegun purchase. See 18 U.S.C. § 1956(a)(1)(B)(i). Although such evidence is needed to sustain a § 1956 conviction, we need not decide whether the government proved this allegation. As discussed above, the jury expressly found Kelerchian guilty of conspiring to violate both § 1956 and § 1957. That means that Kelerchian must show that the evidence was insufficient under either theory to overturn his conviction on Count IX. Because a rational jury could find Kelerchian guilty of conspiracy to violate § 1957, we affirm his conviction on Count IX.

C. *Jury Instructions*

1. *Standard of Review*

Kelerchian raises several objections to the jury instructions. "We review *de novo* whether jury instructions accurately summarize the law, but give the district court substantial discretion to formulate the instructions provided that the instructions represent a complete and correct statement of the law." *United States v. Edwards*, 869 F.3d 490, 496 (7th Cir. 2017), quoting *United States v. Daniel*, 749 F.3d 608, 613 (7th Cir. 2014). We review jury instructions as a whole and in context. *United States v. al-Awadi*, 873 F.3d 592, 598 (7th Cir. 2017).

2. *Conspiracy Instructions*

Kelerchian challenges the jury instructions on three distinct conspiracy charges. Count I alleged that he conspired to make false statements regarding the records required to be kept by a licensed firearms dealer. Making the false statements violated 18 U.S.C. § 924(a)(1)(A), which is the

substantive crime. Similarly, making false statements to the ATF in violation of 18 U.S.C. § 1001 was the substantive crime of Count III's conspiracy charge, and money laundering in violation of § 1956 and § 1957 was the substantive offense in Count IX's conspiracy charge.

To establish a conspiracy to commit an offense against the United States in violation of § 371, the government must prove "(1) an agreement to commit an offense against the United States; (2) an overt act in furtherance of the conspiracy; and (3) knowledge of the conspiratorial purpose." *United States v. Soy*, 454 F.3d 766, 768 (7th Cir. 2006). The government must show only "that the conspirators agreed that the underlying crime *be committed*. … In other words, each conspirator must have specifically intended that *some conspirator* commit each element of the substantive offense." *Ocasio v. United States*, 136 S. Ct. 1423, 1432 (2016). "[T]he fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all the elements of [the underlying substantive] criminal offense.'" *Id.* at 1429, quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997) (alteration in original).

Kelerchian asked the district court to instruct the jury that the government had to prove every element of the substantive offenses underlying the § 371 charges. The court declined to give that instruction and instead, for each of the three relevant conspiracy counts, gave the Seventh Circuit's Pattern Jury Instruction, telling the jurors that that government had to "prove each of the following elements beyond a reasonable doubt:"(1) that the conspiracy charged in the indictment existed; (2) that the defendant knowingly joined the conspiracy with the intent to advance it; and (3) that one of the

conspirators committed an overt act to advance the charged conspiracy. See 7th Cir. Pattern Criminal Jury Instr. § 5.08(A) (2018). For each conspiracy count, the court also gave the jurors an Eighth Circuit Pattern Instruction at the Government's request: "To help you decide whether the defendant conspired to commit" the relevant substantive offense, the jury "should consider the elements of the [substantive offense]." The court then listed the elements of each of the substantive offenses and instructed the jurors that they "should consider these elements in determining whether the defendant conspired to commit" the underlying offense at issue.

Kelerchian argues that these instructions misled the jurors into thinking that they were not obliged to consider the elements of the substantive offenses to convict Kelerchian on the conspiracy charges against him. In particular, he asserts that the use of "should" as opposed to "must" was problematic. He argues that the word "should" suggested that the jury could disregard entirely the elements of the substantive crimes in the conspiracy charges and convict on a finding that a generic conspiracy existed, rather than a conspiracy to commit a specific, defined crime. The problem was exacerbated, Kelerchian contends, by instructions saying that the government must prove the elements of conspiracy beyond a reasonable doubt.

These instructions were not erroneous. We have said before that "should" and "must" are interchangeable in this context: "[B]oth words are imperative when used to instruct a jury," and "it is hardly plausible that a jury would reach a different verdict based on the use of 'should' or 'must.'" *United States v. Davis*, 724 F.3d 949, 955 (7th Cir. 2013). That is how the district court used the terms throughout its instructions

here. The jurors were instructed that, in deliberations, they "should" or "should not" do a variety of things that are mandatory or prohibited. For example, the jurors were told that they "*should not* consider the possible punishment for the defendant who is on trial," "*should* rely on your independent recollection of the evidence," "*should not* be unduly influenced by the notes of other jurors," and "*should* find the defendant not guilty" if the government failed to prove all elements of an alleged offense beyond a reasonable doubt. We see no meaningful difference between the framing of these instructions and the instructions to which Kelerchian objects.

The instructions communicated correctly that to convict on the conspiracy counts, the jury needed to find that Kelerchian "agree[d] with [the] others to commit the acts which constitute the substantive offense[s]" defined by § 924(a)(1)(A), § 1001, and §§ 1956 and 1957. *United States v. Craig*, 573 F.2d 455, 486 (7th Cir. 1977). There was no error.

### 3. *Demonstration Letter Instruction*

Kelerchian also argues that the district court erroneously instructed the jury regarding ATF's requirements for demonstration letters. His issue is with Instruction 27, which said in relevant part:

> Machine guns may also be imported as dealer samples if a dealer can establish to the Bureau of Alcohol, Tobacco, Firearms and Explosives by specific information:
>
> o   that there is a governmental customer requiring a demonstration of the weapons; and

> o the weapons are available to fill sub-
> sequent orders.
>
> In addition, the governmental entity must pro-
> vide a letter expressing a need for a particular
> model or interest in seeing a demonstration of a
> particular weapon.
>
> If a dealer requests more than one machine gun
> of a particular model, he must also establish his
> need for the quantity of samples sought to be
> imported.

Kelerchian contends that this instruction selectively pulled a phrase from 27 C.F.R. § 479.112(c), which governs the registration of imported firearms, including those acquired pursuant to demonstration letters, to create the erroneous impression that "dealer sales samples required a demonstration of the weapons" to take place. The government responds that Kelerchian is focusing on the wrong regulation. Instruction 27 addressed 27 C.F.R § 479.105, which applies to the transfer, rather than the importation, of machineguns, and subsection (d) specifically deals with demonstration letters. In short, § 479.112(c) applies to importation of firearms for demonstrations and § 479.105(d) applies to domestic transfers of machineguns for the same purpose. Kelerchian was alleged to have conducted dealer sample purchases involving the importation of machine guns only in Count IV. The remaining counts involved domestic transfers.

Regardless of which regulation Instruction 27 is based on, Kelerchian's challenge fails because the instruction did not say that the dealer must *actually* perform a demonstration. It said that a dealer must show "that there is a governmental

customer *requiring* a demonstration." Another instruction told the jury: "The law does not require a dealer who receives a machine gun for use as a sale sample to do a demonstration of the machine gun." The instructions as a whole correctly stated the law.

D. *Closing Argument Issues*

Kelerchian also argues that the government committed prosecutorial misconduct and improperly amended the indictment. Neither argument is persuasive.

1. *Prosecutorial Misconduct*

We review claims of prosecutorial misconduct in two steps. "First, we determine whether the prosecutor's comments were improper standing alone. Second, we ask whether the remarks in the context of the whole record denied the defendants the right to a fair trial." *United States v. Durham*, 766 F.3d 672, 684 (7th Cir. 2014), citing *United States v. Bell*, 624 F.3d 803, 811 (7th Cir. 2010). To evaluate the relevant statements in context to determine whether they deprived a defendant of a fair trial, we consider "1) the nature and seriousness of the misconduct; 2) the extent to which the comments were invited by the defense; 3) the extent to which the prejudice was ameliorated by the court's instruction to the jury; 4) the defense's opportunity to counter any prejudice; and 5) the weight of the evidence supporting the conviction." *United States v. Common*, 818 F.3d 323, 333 (7th Cir. 2016).

At trial, Kelerchian did not object to the prosecution's arguments in closing that he now argues are improper. We therefore review only for plain error. "On plain-error review, we may reverse if: (1) an error occurred, (2) the error was plain, (3) it affected the defendant's substantial rights, and (4)

it seriously affected the fairness, integrity, or public reputation of the proceedings." *United States v. Pierson*, 925 F.3d 913, 919 (7th Cir. 2019), citing *United States v. Olano*, 507 U.S. 725, 732–38 (1993). Together, these inquiries mean that Kelerchian "must demonstrate that the comments at issue were 'obviously' or 'clearly' improper … [such] that not only was [he] deprived of a fair trial, but also that the outcome of the trial probably would have been different absent the prosecution's remarks*." United States v. Hills*, 618 F.3d 619, 640 (7th Cir. 2010) (internal citation omitted). In essence, the question is whether the argument was so egregious that the trial judge was required to intervene without a defense objection.

Kelerchian argues that the government's rebuttal improperly appealed to the jurors' emotions and invited them to consider the societal consequences of their verdict. Some background is needed on relevant testimony solicited during trial. There was testimony throughout trial that the machineguns Kelerchian and his co-conspirators requested for dealer sales samples were not appropriate for use by the Sheriff's Department. They included a "multipurpose belt-fed machine gun … typically used on top of a Humvee or maybe on the door of a helicopter" and a "light-weight, belt-fed machinegun," "designed for the Navy SEAL teams for warfare." Testimony of this nature helped show that the dealer sales sample letters were fraudulent because the Sheriff's Department had no use for the sample firearms.

In closing, defense counsel responded by pointing out that the ATF agreed to allow H&K to provide these weapons to Kelerchian to demonstrate to the Sheriff's Department:

> I want to talk now about the demonstration letters. Count 3 is charged as a conspiracy. Counts

4 through 7 are charged as making the actual statement, the false statement. Every letter at issue in this case says, well, basically the same thing … approximately seven letters on the Lake County Sheriff's Department letterhead requesting firearms demonstrations of machine guns from Kelerchian knowing the same to contain a materially false, fictitious, and fraudulent statement because Vahan Kelerchian very well knew in fact, no demonstration was going to occur.

First of all, ladies and gentlemen, every single one of those letters was accepted by the ATF, was signed off by numerous people from the ATF as justifying the transfer of those guns. This whole discussion about these guns not being appropriate for the Lake County Sheriff's Department is completely undercut by ATF signing off and indicating that, in fact, these are the kinds of weapons that are justifiable in a demonstration letter.

Defense counsel emphasized the point a second time in closing: "ATF found [these] letter[s] acceptable."

In rebuttal, the government responded:

There is no way on earth that these types of guns, any department would require a demonstration because they're belt-fed machine guns … [T]hese guns are so far outside the bounds of what regular law enforcement uses that there is no legitimate reason to have them

demonstrated. They're belt-fed machine guns with ammunition that is three inches long. There's no reason on earth why any law enforcement agency would want them to be demonstrated. Mr. Kelerchian wants those. He told you that, but there's no reason an agency would want them demonstrated. … That's why the demonstration letters are utter nonsense because the weapon is so far out of bounds it doesn't make any sense. Under their rationale, the Lake County Sheriff's Department, Mr. Kelerchian, could demonstrate a tank, and he would get to keep it. How absurd is that? The law isn't meant to function in absurdities. It's meant to be applied by rational people such as you to *determine what's acceptable*.

Kelerchian argues that the prosecution's use of the word "acceptable" invited the jury to decide what is socially acceptable as opposed to what is legal. According to the government, its use of the term "acceptable" in context was meant only to remind the jury that its job was to determine whether the letters requesting demonstrations were legitimate. In rejecting a similar claim of plain error in closing argument, we have noted that "[l]awyers sometimes are not as precise as they should be when giving extemporaneous closing arguments." *United States v. Thomas*, — F.3d —, — , 2019 WL 3490675, at *6 (7th Cir. Aug. 1, 2019). This jury was instructed to focus on the instructions and to remember that lawyers' arguments are not evidence. The government's use of the ambiguous term "acceptable," which did not even draw an objection, did not deny Kelerchian a fair trial or rise to the level of plain error.

2.  *Constructive Amendment*

A constructive amendment of an indictment occurs in violation of the Fifth Amendment when the jury is allowed "to convict for an offense outside the scope of the indictment." *Pierson*, 925 F.3d at 919–20. Kelerchian argues that the government's closing attempted to change its theory of liability as to the demonstration letter charges in Counts III through VII. The government argued in rebuttal:

> In Instruction Number 27, it tells you how you get these guns into the country for purposes of a demonstration. You know, it's sales samples. That's what it's called, dealer samples. There's a couple requirements. It's pretty loose. I'll grant you that. And there certainly doesn't have to be any demonstration—and I mentioned that to you in the first part of my closing—but whether or not one occurs is sort of helpful to know whether or not they intended one. And it says that you have to have a document with specific information that there was a governmental customer requiring a demonstration of the weapon.

Again, there was no objection to this argument. On appeal, Kelerchian argues that the reference to "'a document with specific information' … led the jury to underst[and] that the 'document' the government referred to in relation to Instruction No. 27, [was], in fact the [demonstration] letters referenced in Counts 3–7." Although Kelerchian does not spell this out clearly, he implies that the government changed its theory for Counts III through VII, arguing now that the "false statements" were in an unspecified document submitted to H&K

as opposed to in the demonstration letters as alleged in the indictment.

We see no error, let alone a plain error. The government was always clear that the demonstration letters were the basis for Counts III through VII. They were the documents that contained the "specific information" asserting "that there is a governmental customer requiring a demonstration of the weapons." The government's closing did not indicate otherwise simply because in this excerpt it uses the term "document" as opposed to "demonstration letter."

The judgment of the district court is

AFFIRMED.